**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Francisco HERNANDEZ–ALVARADO,
Defendant–Appellant.**

**No. 88–1265.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1989.

Decided Dec. 14, 1989.

Jose H. Robles, Asst. Federal Public Defender, Tucson, Ariz., for defendant-appellant.

Janet K. Johnson, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before GOODWIN, Chief Judge, and ALARCON and NELSON, Circuit Judges.

NELSON, Circuit Judge:

Defendant Hernandez–Alvarado appeals the district court's conviction and denial of his motion to suppress evidence.[1] Defendant claims that police officers did not have reasonable suspicion to stop his car, and thus conducted an illegal search and seizure in violation of the fourth amendment. We agree and reverse the district court's ruling.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 22, 1987, United States Border Patrol Agents Christopher Truty and Diane Smith were conducting traffic surveillance on Interstate Highway 19 near Nogales, Arizona. As they headed northbound, approximately eight kilometers from the Mexican border, they saw defendant's beige Oldsmobile traveling in front of them. Agent Truty noticed that defendant's vehicle had a large trunk capacity, capable of carrying contraband.

Truty pulled up alongside defendant's vehicle and saw defendant and two passengers, a nine or ten-year-old and an older woman, sitting in the front seat of the car.[2] Hernandez–Alvarado looked toward the agents, then quickly turned away and directed his attention to the road. All three occupants were sitting in a rigid and uptight manner, were not speaking to each other, and appeared to have "tunnel vision." Hernandez–Alvarado reduced his speed from 65 miles per hour to 55 miles per hour. The posted speed limit was 65 miles per hour. Agent Truty was suspicious of this behavior and dropped back to follow the vehicle.

From behind, Truty noted several factors which led him to believe he had reasonable suspicion to stop the defendant. First, Hernandez–Alvarado's car displayed a "Best Deal Auto" license plate frame. Truty stated that Best Deal Auto was an auto dealership known among Nogales area agents as notorious for narcotics activity. Nogales agents had seized marijuana from several vehicles bearing the "Best Deal Auto" logo; however, Truty stated that he believed law-abiding citizens also purchased vehicles at the dealership. We have no statistics concerning the number of car dealerships in Nogales or the number of cars sold to innocent people by Best Deal Auto.

Truty further noticed an antenna protruding from defendant's trunk. Drug smugglers frequently use radios with such antennas to communicate with co-conspirators, but Truty did not notice any gestures to indicate that defendant used a radio.

Truty decided to check the vehicle's registration. While waiting for the results, he continued following defendant's vehicle, which maintained a speed of 55 miles per hour and proceeded in a very cautious manner. Hernandez–Alvarado looked in his rearview mirror at the agents several times but never attempted to evade the agents or exit the interstate on one of the two off-ramps passed.

The registration check revealed that the car's owner lived in the Monte Carlo neighborhood of Nogales, Arizona, a neighborhood adjacent to the Mexican border. There were indications that narcotics had been smuggled across the border into Monte Carlo during the preceding two weeks. The neighborhood was under investigation for narcotics activity, but the particular address on the vehicle's registration was not under investigation.

---

1. Although Judge Robert C. Broomfield presided at trial, Judge Alfredo C. Marquez of the United States District Court for the District of Arizona entered the order denying appellant's motion to suppress evidence.

2. Most other cars contained individuals driving to work. At the suppression hearing, Truty stated that there is a trend among drug smugglers to travel in the early morning in order to blend in with the work force. However, the incident occurred the week of Christmas, making family travel in the morning less unusual.

Based on the above factors, Truty pulled defendant's vehicle over about 10 kilometers from where the car first attracted his attention. The agents found about 258 pounds of marijuana in Hernandez–Alvarado's trunk. Defendant was charged with one count of possession with intent to distribute 100–1000 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and 841 U.S.C. § 841(b)(1)(B)(vii) on January 13, 1988. Defendant filed a pre-trial motion to suppress the evidence found in the trunk, claiming the agents had no reasonable suspicion to stop his car. The motion was denied on March 3, 1988. A jury found Hernandez–Alvarado guilty as charged on March 8, 1988. He was sentenced to a five-year prison term with a four-year special parole term.

## DISCUSSION

■ Whether Truty had reasonable suspicion to justify an investigatory stop is a mixed question of law and fact which we review *de novo*. *United States v. Thomas*, 844 F.2d 678, 680 (9th Cir.1988). An officer may make an investigatory stop if he is aware of specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 416–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). Such determination is not readily reduced to "a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). The officer must consider the "totality of the circumstances— the whole picture." *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695).

■ The facts are to be interpreted in the light of a trained officer's experience. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. They must, however, be more than the mere subjective impressions of a particular officer. Permissible deductions or rational inferences must be grounded in objective facts and be capable of rational explanation; "while an officer may evaluate the

facts supporting reasonable suspicion in light of his experience, experience may not be used to give the officers unbridled discretion in making a stop." *Nicacio v. United States I.N.S.*, 797 F.2d 700, 705 (9th Cir.1985).

The facts of this case present a close question as to whether or not there was reasonable suspicion under the above guidelines. The factors known to Agent Truty at the time he stopped defendant present a "totality of circumstances" that seems to fall somewhere between cases which have found reasonable suspicion and those which have not. Thus, before analyzing the instant case, it is useful to survey the relevant caselaw with respect to this issue.

I. *Cases which have found no reasonable suspicion.*

In the landmark case of *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court held that officers may not arbitrarily stop all persons of Mexican appearance and question them about their citizenship without any reasonable suspicion that they are illegal aliens. Although there was no reasonable suspicion in *Brignoni–Ponce*, the court articulated certain factors an officer may consider in determining reasonable suspicion. They include the characteristics of the area in which they encounter a vehicle, proximity to the border, usual patterns of traffic, recent illegal border crossings, a driver's behavior, and aspects of the vehicle itself. *Id.* at 884–85, 95 S.Ct. at 2581–82. Subsequent interpretations of these factors have created a highly inconsistent body of law, and some of the factors have been given lesser weight in contexts other than illegal alien smuggling.

In *United States v. Carrizoza–Gaxiola*, 523 F.2d 239 (9th Cir.1975), state and federal officers were engaged in a joint effort to intercept stolen cars being transported into Mexico at Nogales, Arizona. Each week, about 30 late-model Ford LTDs were stolen, and some of them were discovered in Mexico. Based on this information, officers stopped defendant due to his Mexican

appearance and the fact that he was driving from Tucson to Nogales in a late-model Ford LTD which appeared to be brand new. The Ninth Circuit held that the officers lacked reasonable suspicion.

In the narcotics arena, this court found no reasonable suspicion in *United States v. Morrison,* 546 F.2d 319 (9th Cir.1976), where defendant's ten-year-old car was dust-free, unfamiliar to officers, had a large trunk, bore an out-of-town license plate frame, and was traveling two and a half miles from the border on a highway in a notorious drug-smuggling area. Three years later, in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court held that without any specific indication that suspects have been engaged in criminal activity, police officers do not have reasonable suspicion to justify an investigatory stop. In *Brown,* the officers had detained two men walking away from each other in an alley in an area with a high incidence of drug traffic. The officers believed the men had just met or were about to meet for a drug transaction when their patrol car appeared but, as "the appellant's activity was no different from the activity of other pedestrians in that neighborhood," the investigatory stop was not justified.[3] *Id.* at 52, 99 S.Ct. at 2641.

## II. *Cases which have found reasonable suspicion.*

When courts have upheld a finding of reasonable suspicion, it has been on the basis of more particularized information. In *United States v. Garcia–Nunez,* 709 F.2d 559 (9th Cir.1983), officers had received an anonymous tip that a specific address and vehicle were being used for smuggling aliens.[4] Upon investigation of the tip, officers observed such particularized behavior as a man conducting "counter-surveillance" and serving as a lookout. On the lookout's signal, four men walked hurriedly from the suspect's house to the exact car identified in the tip. The men sat low in the rear seat and appeared to be of Mexican descent. The court held that these factors together supported a finding of reasonable suspicion.

In *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), officers had on several occasions observed the tracks of 8 to 20 people leading across the desert from the Mexican border to a specific point on Highway 86, a road running parallel to the border. Through careful study, these officers determined the likely night of the next alien smuggle, the precise mile marker of the highway pickup, the type of vehicle that would be used to carry many passengers, the time the pickup would be made, the direction the vehicle would come from and return to, and how long it would take the vehicle to get from the officers' stake-out point to the pick-up point and back again. *Id.* at 413–15, 101 S.Ct. at 692–94. Based on this information, they stopped the one vehicle which fit every criterion and found six illegal aliens inside. The court held that reasonable suspicion existed since, based on the totality of circumstances and in light of the officers' experience, the police could reasonably surmise that the vehicle stopped was engaged in criminal activity. *Id.* at 421–22, 101 S.Ct. at 697.

---

**3.** Even in the illegal alien context, the standard is unclear. In the consolidated cases of *United States v. Munoz* and *United States v. Ortiz,* 604 F.2d 1160 (9th Cir.1979), the court held that the totality of the circumstances did not support reasonable suspicion where two vehicles were traveling in tandem on a hot summer day, one contained a child in the front seat between two adults and bucket seats, the drivers had a Mexican appearance, and vehicle occupants did not look at the agents.

In *United States v. Ortega–Serrano,* 788 F.2d 299 (5th Cir.1986), the Fifth Circuit found reasonable suspicion lacking where defendant's car was stopped 300 to 400 miles from the border

notwithstanding the presence of the following factors: the uneven, home-made paint job on defendant's car; the erratic, evasive manner of the defendant's driving; the dirty appearance of the defendant and his passengers, as if they had slept without combing their hair; the nervous demeanor of the passengers riding in the back seat; an indication, based on appearance, that the occupants of the vehicle are of Mexican descent.

**4.** The tip was specific to the point of containing the license plate, color and make of the suspect automobile. *Garcia–Nunez,* 709 F.2d at 561.

In the narcotics context, the Ninth Circuit has found reasonable suspicion where the police acted on highly specific information. For example, in *United States v. Sutton*, 794 F.2d 1415 (9th Cir.1986), officers observed a small plane make a low-flying pass over a vehicle at Bombers Square, a commonly used smuggling area. They had previously observed the same airplane and the same vehicle being used by a smuggling organization for narcotics activity, and the officers had also intercepted messages from the airplane to the vehicle which could reasonably be interpreted as referring to a drug transaction in progress. Under these circumstances, this court held that the police had reasonable suspicion to stop the ground vehicle.

The same particularity was required in two other Ninth Circuit cases dealing with different crimes. In *Guam v. Ichiyasu*, 838 F.2d 353 (9th Cir.1988), the police department broadcast several reports describing a hit-and-run driver's car and notifying officers that it was headed down a dead-end road that terminated at a pier. An officer near the area observed a taxi leaving the dead-end road, at a deserted time of night, carrying one passenger who seemed out-of-place in the area.[5] The court held that these facts supported reasonable suspicion.

In *United States v. Nikzad*, 739 F.2d 1431 (9th Cir.1984), the defendant drew attention to himself in an airport when he kept looking back nervously at officers who were observing arriving passengers. Officers followed Nikzad to the baggage claim area, where he "continually shifted his weight from foot to foot and walked back and forth. At one point he stared at the officers, but avoided eye contact and moved out of view when one agent returned the stare." *Id.* at 1432. Defendant's unusually nervous behavior was sufficient, the court held, to constitute reasonable suspicion for narcotics possession. *Id.* at 1433.

Finally, in *United States v. Thomas*, 844 F.2d 678 (9th Cir.1988), the court found reasonable suspicion in a counterfeit case. Again, the police had broadcast specific information about the suspects' location and description. An officer near the location observed two men attempting to exit a parking lot the wrong way across the street from the reported location. The two men fit the broadcast description, and the officer concluded that it would be likely for the suspects to be exiting a parking lot the wrong way in their haste to leave the area. *Id.* at 681–83.

### III. *The Instant Case*

In ascertaining whether the officers acted on reasonable suspicion in the instant case, we must determine from the totality of the circumstances whether their inference of criminal conduct was based on specific, articulable facts. *See Cortez*, 449 U.S. at 416–18, 101 S.Ct. at 694–95. No single factor is dispositive in this assessment; the issue is whether "taken together, they amount to reasonable suspicion." *Sokolow*, 109 S.Ct. at 1586.

■ The record indicates that the officers' suspicions were founded on a number of events, the most significant of which are the following: (1) the nervous demeanor of both the defendant and his passengers as they sat in the truck; (2) the reduction in speed from 65 to 55 m.p.h.; (3) the presence of a two–way antenna on the trunk of the vehicle; (4) defendant's residence in a neighborhood on the U.S.–Mexican border which was under investigation for narcotics activity; (5) the license plate bracket indicating that the car had been purchased from a dealership associated with drug trafficking; and (6) the size of defendant's trunk.

Considered jointly, these factors are insufficient to justify an investigatory stop. While they may allow certain inferences to be drawn, they describe too many individuals to create a reasonable suspicion that

---

**5.** The officer in *Ichiyasu* "saw a cab with an elderly well-dressed passenger emerging from the road which was in a non-residential area at two o'clock in the morning. He knew that

sailors and power plant workers might be present [there] at such an hour. An elderly, well-dressed man seemed out of place in the area." *Ichiyasu*, 838 F.2d at 356.

this particular defendant is engaged in criminal activity. For example, while the car dealership in question has been associated with drug activity, many citizens with no connection to drug trafficking also have purchased family vehicles there. Likewise, many law-abiding motorists have two-way antennas installed on their cars, live near the Mexican border, and reduce their speed on the freeway when being followed by a law enforcement vehicle. Thus, these facts in combination do not constitute reasonable suspicion.

Even adding the fact that defendant and his passengers sat in the vehicle silently staring ahead when the car carrying DEA agents approached, defendant's alleged nervousness is insufficient to create reasonable suspicion.[6] The instant case is readily distinguishable in this regard from *Nikzad*, where the defendant drew attention to himself by glancing repeatedly at the DEA officers in a furtive manner, continually shifted back and forth, and moved out of view of the agents when they looked at him.

As we stated earlier, this is a close case and the court is mindful that law enforcement personnel who deal in probabilities rather than certainties must rely on their experience to make "common-sense conclusions about human behavior." *Sokolow*, 109 S.Ct. at 1585 (quoting *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695). In exercising their judgment, however, police officers may not infringe the privacy rights of individuals without just cause, regardless of any eventual determination of guilt. In this case, where the totality of the circumstances did not justify an investigatory stop, the search of Hernandez–Alvarado's car by Border Patrol Agents Truty and Smith violated appellant's fourth amendment rights. Accordingly, the judgment of the district court is REVERSED.

ALARCON, Circuit Judge, concurring in the Judgment:

I concur in the majority's conclusion that the district court erred in denying appel-

lant's motion to suppress. I write separately because I do not agree with my colleagues that the facts of this case present a close question.

The Supreme Court in *United States v. Sokolow*, 109 S.Ct. 1581 reiterated "one of the relatively simple concepts" that in reviewing the record to determine whether reasonable suspicion existed justifying a detention, "we must consider 'the totality of the circumstances—the whole picture....'" *Id.* 109 S.Ct. at 1585 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). In upholding the detention in *Sokolow*, the Court also relied on its prior holding in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). In reversing a finding of reasonable suspicion in *Reid v. Georgia*, the Court concluded that the circumstances relied upon by the officer to justify a detention "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case would justify a seizure." *Id.* at 441, 100 S.Ct. at 2754.

The facts articulated by Agent Truty in this matter, to justify curtailing Hernandez–Alvarado's liberty, describe a very large group of presumably innocent persons who live in or near Nogales, Arizona. At 8:00 a.m., Agent Truty saw a man, a woman, and a nine or ten-year-old child traveling in an automobile three days before Christmas on an interstate highway near Nogales, Arizona. This conduct appeared suspicious to Agent Truty because, in his opinion, drug smugglers travel at that time to blend in with the work force. Apparently, in the officer's view of the Constitution, his suspicion would justify stopping all automobiles on the highway because one of them might possibly contain smugglers trying to blend into commuter traffic.

---

6. In fact, avoidance of eye contact has been deemed an inappropriate factor to consider unless "special circumstances [ ] make innocent avoidance of eye contact improbable." *Nicacio*

*v. United States I.N.S.*, 797 F.2d 700 (9th Cir. 1986). Here, the fact that Hernandez–Alvarado was driving precludes the presence of any such circumstances.

Agent Truty was also suspicious because the automobile *reduced* its speed from the posted limit of 65 miles per hour to 55 miles per hour after the driver looked at the Border Patrol Agent's marked vehicle. Presumably, Agent Truty's suspicions would also have been aroused if the vehicle increased its speed!

Agent Truty also noted that the driver turned away after seeing him and directed his attention to the road ahead. This conduct caused Agent Truty to follow the vehicle. I fail to see how compliance with an elementary rule of highway safety, i.e., keeping your eyes on the traffic ahead, can demonstrate reasonable suspicion of on-going criminal activity, especially at 55 miles per hour.

Agent Truty also observed that Hernandez–Alvarado's vehicle had a "Best Deal Auto" license plate frame. According to Agent Truty, Border Patrol Agents in the Nogales area had seized marijuana from several vehicles bearing the "Best Deal Auto" license plate frames. The record shows that innocent, law-abiding citizens also purchased vehicles from Best Deal Auto. If this factor can justify a detention, then all purchasers of automobiles from Best Deal Auto would be subject to random searches without proof of any particularized suspicion that they were engaged in criminal activity.

Agent Truty testified that he took into consideration, in determining that he could stop Hernandez–Alvarado's vehicle, that it had large trunk capacity capable of carrying contraband and a radio antenna protruding from the trunk lid. He also testified that drug smugglers use similar antennae to communicate with their confederates. No evidence was offered to show that the car in fact had a broadcasting unit or that Hernandez–Alvarado attempted to communicate with anyone prior to the stop.

The trunk space of Hernandez–Alvarado's vehicle was apparently the same as that found on all Oldsmobiles of the same vintage. Clearly, it would be a violation of fourth amendment principles to permit random searches of all vehicles simply because they were manufactured with large trunk capacity.

Agent Truty's check of the vehicle registration established that the owner, Guadalupe Hernandez–Ramos, lived in the Monte Carlo area of Nogales, Arizona. Agent Truty testified that this neighborhood was under investigation for narcotics activity. However, the owner's address was not under investigation. Nevertheless, the fact that the owner of the car lived in that neighborhood was relied upon by Agent Truty to stop a vehicle, driven by a man who obviously was not the registered owner, without any evidence that the owner or the driver was suspected of on-going criminal activity. The fourth amendment does not contemplate the random search of all vehicles in a neighborhood because some of the residents are known criminals.

Agent Truty's unparticularized suspicions proved accurate. A large quantity of marijuana was found in the trunk. It is of course black letter law that a search cannot be justified by the seizure of contraband. Long ago, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court instructed that a detention cannot be justified by an officer's "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883. The Court reaffirmed this principle in *Sokolow*, 109 S.Ct. at 1585.

As noted by the majority, we have rejected the government's suggestion in a number of other matters that similar lucky hunches justified a detention. Majority Opinion at 1416–17. Recently in *United States v. Robert L.*, 874 F.2d 701, 703–05 (9th Cir.1989), we held that a *Terry* stop was not justified where the same Border Patrol Agent, Truty, testified that the defendant "glanced quickly" at the officer "and then returned his eyes to the road." We concluded that this activity was normal under the circumstances. *Id.* at 703. We also observed that the fact that an older model Oldsmobile had a large trunk provided "scant support" where it did not appear to be heavily loaded and there were "no other distinguishing attributes." *Id.* at 705. In the matter before this court, there

is no evidence that the Oldsmobile driven by Hernandez–Alvarado appeared to be heavily loaded or had been modified to carry contraband.

The majority correctly notes that we have required more particularized information in previous cases to support a finding of reasonable suspicion of criminal activity to justify a *Terry* stop. Majority opinion at 1417–18; *see also United States v. Woods,* 720 F.2d 1022, 1026–27 (9th Cir. 1983) (officers had reasonable suspicion of criminal activity where reliable informant told them a pregnant woman accompanied by a small child was going to meet a woman who would be arriving at the San Diego airport carrying cocaine and officers observed a woman fitting this description display the contents of a box to another woman); *United States v. Perez–Esparza,* 609 F.2d 1284, 1286 (9th Cir.1979) (officers had reasonable suspicion to stop defendant's car where a reliable informant identified defendant's car as one used to smuggle narcotics into the United States from Mexico).

In this matter, the district court upheld the detention of a Hispanic man who was driving an old car near the Mexican border, accompanied by his wife and ten-year-old child, in commuter traffic within the speed limit, based on testimony that (1) smugglers drive at that time to escape detection, (2) the car was purchased from a dealer who sells automobiles to drug traffickers and non-drug traffickers, and (3) it was registered to a person who lives in a neighborhood where other persons have been arrested for narcotics trafficking. The above facts describe a majority of the persons who live near our border with Mexico. To uphold the district court's order, we would have to condone random detention and searches of a large number of American residents simply because they live in a depressed, crime ridden border area, drive old cars, when accompanied by their families, and look straight ahead after seeing a law enforcement vehicle.

Under *Reid v. Georgia,* and *United States v. Sokolow,* we are compelled to reverse the district court's order upholding this detention of presumably innocent travelers.