960 F.2d 153
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Maria ROJO-AGUILAR, Defendant-Appellant.
 No. 91-10350.
 United States Court of Appeals, Ninth Circuit.
 Submitted March 4, 1992.*
Decided April 17, 1992.
 
 Before BOOCHEVER, BEEZER and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 This case addresses whether two border patrol agents had reasonable suspicion to stop a pickup truck, a subsequent search of which yielded 136 pounds of marijuana. Jose M. Rojo-Aguilar appeals his conviction upon a conditional guilty plea. We have jurisdiction and we affirm.
 
 
 3
 * From Arivaca, Arizona, Ruby Road leads to Pena Blanca Lake. The dirt road runs through an area that is arid, desolate and close to the Mexican border. The area had recently experienced a number of narcotics transshipments.
 
 
 4
 At approximately 7:00 p.m. on December 26, 1990, Agent Sparks observed a clean 1979 silver Dodge pickup driving toward Arivaca on Ruby Road. The cold temperature made it unlikely that the truck had been used for recreational purposes. Agent Sparks did not recognize the truck as that of a local rancher. A Hispanic male appeared to be driving the truck, which had a large tool box attached to its bed. Agent Sparks and his partner Agent Santana followed the truck.
 
 
 5
 Agent Sparks testified that the truck proceeded at about forty to forty-five miles per hour. He testified that the speed limit on Ruby Road is about twenty-five miles per hour. Agent Santana corroborated that the truck proceeded at forty-five miles per hour. After clearing a blackout zone of some hills and curves, Agent Sparks received a radio transmission informing him that the truck was registered to Harvey W. Hendricks of Tucson.
 
 
 6
 Upon arriving in Arivaca, the truck turned and headed toward Tucson on Arivaca Road, a paved road, which Agent Sparks testified has a fifty-five mile per hour speed limit except in certain curves. Agent Santana testified that she recalled the speed limit being thirty-five to forty miles per hour. Both agents agreed that the truck proceeded at twenty to twenty-five miles per hour on Arivaca Road. Agent Sparks stopped the truck about three miles outside of Arivaca on Arivaca Road. The stop led to the discovery of 136 pounds of marijuana in the tool box and the arrest of Rojo-Aguilar.
 
 
 7
 Rojo-Aguilar testified that he drove at twenty to twenty-five miles per hour on Ruby Road and forty to forty-five miles per hour on Arivaca Road.
 
 
 8
 Upon Rojo-Aguilar's motion, the district court held a hearing on March 18, 1991, to determine whether the marijuana should be suppressed because the agents lacked reasonable suspicion to stop him. The district court believed the agents and not Rojo-Aguilar with respect to the facts surrounding vehicle speed. It found that Rojo-Aguilar drove forty-five in a twenty-five zone and twenty-five in a fifty-five zone. The district court further concluded that a Christmas traveler from Tucson would not take the route driven by Rojo-Aguilar.
 
 
 9
 The district court denied Rojo-Aguilar's motion to suppress. Pursuant to Fed.R.Crim.P. 11(a)(2), on April 9, 1991, Rojo-Aguilar entered a conditional guilty plea to a charge of possession of between 50 and 100 kilograms of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c). On June 24, 1991, the district court sentenced Rojo-Aguilar to 21 months in prison, followed by 60 months of supervised release. He is presently serving his sentence.
 
 
 10
 Rojo-Aguilar points out that the agents had stopped and searched another truck earlier on the evening of December 26, 1990.[1] The district court ruled that stop clearly improper. In commenting on that stop during Rojo-Aguilar's hearing, the district court noted, "I think they made a decision that night that they were going to stop every truck coming down the road."
 
 II
 
 11
 We review de novo whether reasonable suspicion existed for an investigatory stop. United States v. Franco-Munoz, 952 F.2d 1055, 1056 (9th Cir.1991). Even though we review this mixed question of law and fact de novo, we review the establishment of underlying basic facts for clear error. United States v. McConney, 728 F.2d 1195, 1200-02 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984). Such review entails "due regard" for the district court's credibility determinations. Amadeo v. Zant, 486 U.S. 214, 223 (1988).
 
 III
 
 12
 "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion...." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). Such a stop requires an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417 (1981). The totality of circumstances must present "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id. at 417-18. An officer assesses the circumstances based on probabilities, not certainties, and, based on his or her training, draws inferences that might elude the untrained person. Id. at 418.
 
 
 13
 The Supreme Court has enumerated a noncomprehensive list of factors an officer might properly consider in assessing the totality of the circumstances: (1) the characteristics of the area where the arrest occurred, (2) information on recent illegality[2] in the area, (3) a driver's erratic or suspicious behavior, (4) physical attributes of a vehicle that might aid in the perpetration of a crime, (5) whether a vehicle is heavily loaded and (6), in appropriate circumstances, alienage. Brignoni-Ponce, 422 U.S. at 884-87. The Court recently rejected our effort to accord certain factors primacy over others. United States v. Sokolow, 490 U.S. 1, 6-10 (1989). Although each factor individually might have an innocent explanation, an officer may make a stop if "taken together they amount to reasonable suspicion." Id.
 
 
 14
 Agents Sparks and Santana considered the following factors: (1) proximity to a remote stretch of border with many roads and trails leading to the border; (2) knowledge of recent narcotics transshipments through the area; (3) Rojo-Aguilar's erratic speeds and suspicious driving;[3] (4) the cleanliness of the pickup in a dusty environment, and the tool box that could facilitate drug concealment; (5) a Hispanic male driving a pickup registered to one with a non-Hispanic name; (6) not recognizing the vehicle as that of a local rancher; (7) the presence of a pickup driving out of the wilderness at night the day after Christmas, the weather being too cold for camping; (8) Ruby Road not being a travel route from Tucson, where the pickup was registered.
 
 
 15
 Rojo-Aguilar argues that his case parallels United States v. Morrison, 546 F.2d 319 (1976). In Morrison, we held that proximity to the border and prior illegal activity in the area were relevant factors, but that driving on a highway in a dust-free ten year old car with a large trunk and out of town tags did not supply the requisite particularized suspicion. Id. at 320. Factors three and five through eight very clearly distinguish this case from Morrison, however, and afford particularized suspicion. In fact, the totality of the circumstances in this case provides a better basis for reasonable suspicion than did the totality of the circumstances in Franco-Munoz, 952 F.2d at 1057-58 (affirming district court's finding of reasonable suspicion).
 
 
 16
 Rojo-Aguilar asserts that the agents impermissibly considered his alienage in their assessment of the totality of the circumstances. We disagree. Brignoni-Ponce concerned the apprehension of illegal aliens in the vicinity of the United States Mexico border. With respect to national origin, the Court held: "The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." Brignoni-Ponce, 422 U.S. at 886-87. Accordingly, in appropriate circumstances, an officer may consider a person's ethnic appearance as a relevant factor. Although the Government would accord this factor relevance far beyond reason, see Government's Brief at 9, Rojo-Aguilar's Hispanic appearance did assume some relevance when the agents discovered that the pickup was registered to a person with a name commonly associated with Anglo heritage. See Franco-Munoz, 952 F.2d at 1057.
 
 
 17
 We have rejected officers' assessments of reasonable suspicion when the factors considered "describe too many individuals to create a reasonable suspicion that this particular defendant is engaged in criminal activity." United States v. Hernandez-Alvarado, 891 F.2d 1414, 1418 (9th Cir.1989); see also United States v. Salinas, 940 F.2d 392, 395 (9th Cir.1991). By focusing on a desolate dirt road, Agents Sparks and Santana significantly narrowed the scope of potential suspects. As well, the time of year and the cold weather conspired to create circumstances in which very few people would be considered suspects. Contra Salinas, 940 F.2d at 393-94 (major commuter highway in morning rush hour); Hernandez-Alvarez, 891 F.2d at 1415 (interstate highway 19). Unlike cases in which large numbers of vehicles with innocent occupants might fit a profile, here Agents Sparks and Santana stopped a vehicle, suspicious on several counts,[4] in a geographic area already properly accorded heightened suspicion.[5] We hold that the totality of the circumstances, each circumstance reinforcing the others, afforded Agents Sparks and Santana the particularized reasonable suspicion needed to stop Rojo-Aguilar.
 
 IV
 
 18
 An officer may not justify the stop of a suspect on one ground when in fact the stop actually pertains to another for which the officer has no reasonable suspicion. United States v. Prim, 698 F.2d 972, 975 (9th Cir.1983). Although this rule generally obtains, we upheld a stop for reckless driving when methamphetamine manufacture was also suspected, United States v. Lillard, 929 F.2d 500, 502 (9th Cir.1991), and an administrative safety inspection partly motivated by suspected drug smuggling, United States v. Eagon, 707 F.2d 362, 365 (9th Cir.1982), cert. denied, 464 U.S. 992 (1983), because the stops would have occurred despite the second reason.
 
 
 19
 Rojo-Aguilar asserts that because the district court thought that the agents "made a decision that night that they were going to stop every truck coming down the road," the fact that reasonable suspicion was present in his case merely afforded a legal pretext to stop him. In support of his argument, he cites United States v. Guzman, 864 F.2d 1512 (10th Cir.1988); United States v. Smith, 799 F.2d 704 (11th Cir.1986). In both of these cases, an officer stopped a suspect for a lesser violation so that he could pursue a "hunch" about a serious felony. Guzman, 864 F.2d at 1515; Smith, 799 F.2d at 710-11. Neither our cases nor the ones cited by Rojo-Aguilar stand for the proposition that when law enforcement sets an overbroad profile, any person stopped pursuant to that profile, including those for whom legitimate reasonable suspicion exists, must go free.
 
 
 20
 In any event, Rojo-Aguilar has not shown that Agents Sparks and Santana stopped every truck they encountered on Ruby Road that evening. That the agents committed one error earlier in the evening should not preclude them from doing their jobs for the rest of their shift. We reject Rojo-Aguilar's argument that Agents Sparks and Santana used a legal pretext to stop him.
 
 V
 
 21
 The district court's judgment of conviction is AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without oral argument pursuant to Ninth Cir.R. 34-4 and Fed.R.App.P. 34(a)
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Rojo-Aguilar states that the other truck "had also been traveling slowly, about 30 miles per hour." If the vehicle was on Ruby Road, its speed was consistent with the speed limit. Rojo-Aguilar does not specify on which road the other vehicle traveled slowly
 
 
 [2]
 In Brignoni-Ponce, this factor concerned information about recent illegal border crossings. 422 U.S. at 885
 
 
 [3]
 Even if the speed limit on Arivaca Road is only thirty-five, Rojo-Aguilar already had driven forty to forty-five through curves on Ruby Road, which has a twenty-five mile per hour speed limit
 
 
 [4]
 See supra factors four, five, six and eight
 
 
 [5]
 See supra factors one, two and seven