990 F.2d 1262
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gilbert ESCALANTE, Defendant-Appellant.
 No. 92-10363.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 9, 1993.
Decided March 22, 1993.
 
 Before CHOY, PREGERSON and BEEZER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 After his motion to suppress was denied, Gilbert Escalante entered a conditional guilty plea for conspiracy to possess and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1). Escalante asserts on appeal that the court erred in denying his motion to suppress because Border Patrol agents lacked reasonable suspicion to stop the Ford in which he was a passenger; therefore the search and seizure conducted by the officers violated his fourth amendment protections.[1] We have jurisdiction under 28 U.S.C. § 1291. We reverse.
 
 BACKGROUND:
 
 3
 On November 11, 1991, Border Patrol Agent Bangs and his partner, Border Patrol Agent Stokes were conducting stationary traffic observation on Interstate 10, immediately east of Tucson, Arizona. At about 2:40 PM, Agents Bangs and Stokes observed a red Ford with two young, Mexican-American male occupants travelling west toward Tucson. The Ford was travelling at 65 mph, the posted speed limit. The agents pulled onto the interstate to investigate the car further. Agent Stokes, who was driving a marked, Border Patrol vehicle, followed directly behind the Ford for about twenty or thirty seconds. The two occupants of the Ford were conversing with each other and appeared to be very relaxed. The driver, Jorge Figueroa, was casually steering the vehicle with his left hand only.
 
 
 4
 The agents pulled their car directly adjacent to the driver's side of the Ford. Agent Bangs, who was in the right front seat of the Border Patrol vehicle, attempted to make eye contact with Figueroa. Agent Bangs was within six feet of Figueroa at this time. Figueroa looked at the agent and responded with a "very shocked look on his face." Figueroa immediately turned his head forward and grabbed the steering wheel with both hands. He slowed the Ford to 55 mph. The passenger, Gilbert Escalante, did not look at the agents. Rather, he slumped down in his seat and picked up some reading material, which he appeared to study intently. Agents Bangs and Stokes continued alongside the Ford for about one-half to three-quarters of a mile and attempted to make further eye contact with its occupants. Figueroa and Escalante did not return the agents' stares.
 
 
 5
 The agents pulled their car behind the Ford and ran a registration check on the license plate. The check revealed that the vehicle was registered to a person with a Spanish surname who had an address in Douglas, Arizona. The agents activated their vehicle's emergency lights and the Ford pulled over. As Agent Bangs approached the Ford, he smelled marijuana and noticed for the first time a couple of suitcases in the car. A subsequent search of the suitcases revealed about 140 pounds of marijuana.
 
 
 6
 Escalante was indicted for violation of 21 U.S.C. § 841(a)(1), conspiracy to possess and possession of marijuana with intent to distribute. Escalante moved to suppress the evidence on the ground that it was the product of an illegal stop and search. The district court denied the motion. Escalante thereafter entered a conditional plea of guilty and filed this appeal.
 
 ANALYSIS:
 
 7
 Escalante contends that the district court committed reversible error in denying the motion to suppress the evidence obtained as a result of the stop of the Ford by the Border Patrol agents. As a question of law, we review de novo whether reasonable suspicion existed for this investigatory stop. United States v. Fouche, 776 F.2d 1398, 1402 (9th Cir.1985).
 
 
 8
 The fourth amendment's prohibition of unreasonable searches and seizures extends to seizures of the person, including brief investigatory stops of vehicles. United States v. Rodriguez, 976 F.2d 592, 594 (9th Cir.1992) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). Hence, an officer may not detain a motorist without a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). This objective basis, or "reasonable suspicion," must consist of "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity." United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir.1989) (citing Cortez, 449 U.S. at 416-18). The officer must consider the "totality of the circumstances" in determining whether reasonable suspicion exists to initiate an investigatory stop. Cortez, 449 U.S. at 417.
 
 
 9
 The record indicates that Agents Bangs and Stokes based their decision to stop the Ford on the following factors: (1) the fact that the occupants were two young, Mexican-American males; (2) the reaction of the occupants when they became aware that they were the focus of the agents' attention, i.e., their failure to make continued eye contact with the agents, their abrupt shift from relaxed to rigid demeanors, and their reduction of speed from 65 mph to 55 mph; and (3) the fact that the Ford was registered to a person with a Spanish surname with an address in Douglas, Arizona. We address each factor in turn.
 
 A. Race and Age
 
 10
 The government contends that because young, "hispanic" males commonly transport narcotics or aliens in southeast Arizona, the agents properly considered Figueroa's and Escalante's race and age as primary factors in deciding whether to initiate the stop. We disagree.
 
 
 11
 We have consistently held that "conduct does not become suspicious simply because the skins of the occupants [of a vehicle] are nonwhite." United States v. Mallides, 473 F.2d 859, 861 (9th Cir.1973). See also Brignoni-Ponce, 422 U.S. at 886 (Mexican ancestry of vehicle's occupants alone cannot justify stop of vehicle on ground that occupants may be undocumented aliens). Similarly, we have held that age, as an immutable trait, cannot alone establish reasonable suspicion of any wrongdoing. United States v. Robert L., 874 F.2d 701, 705 (9th Cir.1989). Rather, the probative value of a person's race and age with respect to suspected wrongdoing is so weak that these traits must be combined with other more probative factors or circumstances that substantially enhance their significance in order to provide a rational basis for stopping vehicles to search. See Nicacio v. United States INS, 797 F.2d 700, 704 (9th Cir.1986).
 
 
 12
 Here, the agents initially decided to follow and investigate Figueroa and Escalante further solely because the two were young, Mexican-American males. The government cites Fouche, 776 F.2d at 1403, to support its contention that an individual's race and age may provide government agents with a basis for suspecting criminal activity. Our holding in Fouche does not, however, lend support to the government's argument.
 
 
 13
 In Fouche, we held that where police were specifically searching for "a black male" suspect, an officer could permissibly consider an individual's race and color as one factor in deciding whether to make a stop. Id. Even then, the officer in Fouche did not initiate a stop of a particular suspect, who was a black male, until the individual had also committed two traffic violations.
 
 
 14
 In contrast, in the instant case, Agents Bangs and Stokes were not on the alert for two young, Mexican-American males who were specifically suspected of criminal wrongdoing. Rather, the agents admit to harboring a generalized suspicion of all young, Mexican-American males in southeast Arizona with regard to their potential involvement in transporting narcotics or aliens. Hence, in the absence of substantially more probative factors for suspecting criminal activity, Agents Bangs' and Stokes' reliance on Figueroa's and Escalante's race and age as a primary basis for initiating the stop was impermissible.
 
 B. Reaction of Occupants
 1. Eye Contact and Overall Demeanor
 
 15
 The government contends that Figueroa's and Escalante's failure to maintain eye contact with the agents and rigid demeanor in response to seeing the agents constituted suspicious conduct. Hence, the government argues that Figueroa's and Escalante's reactions properly contributed to the agents' reasonable suspicion that they were involved in criminal activity. Again, we disagree.
 
 
 16
 We have held that the manner in which a suspect does or does not look at an officer, may be a factor in assessing whether criminal activity is afoot. Robert L., 874 F.2d at 703. "Whether the visual contact or lack of it is furtive and suspicious, however, is highly subjective and must be evaluated in light of the circumstances of each case." Id.
 
 
 17
 Typically, failure to maintain eye contact may be properly deemed "suspicious" in a context wherein eye contact is otherwise natural and unavoidable. For example, in United States v. Nikzad, 739 F.2d 1431 (9th Cir.1984), we held that reasonable suspicion existed to stop a defendant in an airport terminal where he exhibited nervous behavior that included "glances and stares at the officers, nervous shuffling and evasion of police stares." Id. at 1433. In that case, the defendant attempted to move out of view to avoid the stare of one officer. Id. at 1432. Similarly, in United States v. Vasquez-Cazares, 563 F.2d 1329 (9th Cir.1977) (per curiam), cert. denied, 434 U.S. 1021 (1978), we determined that the defendant's avoidance of eye contact was somewhat probative in light of the fact that a marked police car was directly in the line of vision of the defendant. Id. at 1330.
 
 
 18
 In contrast, in United States v. Mallides, we held that reasonable suspicion to stop a car did not exist where "[s]ix Mexican-American appearing males were riding in a Chrysler Imperial at dusk, sitting erectly, and none turned to look at [a] passing patrol car." Mallides, 473 F.2d at 861. From these facts, the officers had suspected that the individuals were undocumented aliens. Id. In reaching our decision, we held that "[c]onduct does not become suspicious simply because ... [occupants in a car] sit up straight or because they do not look at a passing police car." Id.
 
 
 19
 Likewise, in United States v. Munoz, 604 F.2d 1160 (9th Cir.1979), we held that reasonable suspicion to suspect criminal activity did not exist where two vehicles with Mexican-American appearing drivers were driving in tandem and the occupants of each vehicle did not look at nearby agents. Id. at 1161. We stated that the failure of occupants in a moving vehicle to look at agents "adds little to the case in light of the questionable value of the factor generally". Id.
 
 
 20
 Here, the case is directly analogous to Mallides and Munoz. We cannot say that Figueroa's and Escalante's mere refusal to return the continued stares of the agents, who were driving parallel to the two individuals' car, constitutes "suspicious behavior." In contrast to the situation in Nikzad and Vasquez-Cazares, safety considerations alone prohibited Figueroa in particular from maintaining eye contact with the agents while simultaneously driving a vehicle at 55 mph on an open freeway. Likewise, the fact that Figueroa's demeanor shifted from causal to rigid in light of the fact that a marked patrol car was travelling dead-even with his car at 65 mph, and then 55 mph, cannot be construed as anything but a normal reaction. Indeed, in the context in which they were observed, Figueroa's and Escalante's reactions seem more the norm than unusual, suspicious behavior. See Robert L., 874 F.2d at 703. Hence, in the absence of substantially more probative factors, the reactions of Figueroa and Escalante did not provide the agents with a reasonable basis for suspecting criminal activity.
 
 2. Reduction of Speed
 
 21
 The government also contends that Figueroa's reduction in speed from 65 mph to 55 mph provided the agents with a basis for suspecting criminal activity. Figueroa reduced the speed of his car in response to seeing the marked border patrol car driving directly beside him.
 
 
 22
 In certain instances, reduction of speed in response to seeing a police vehicle may contribute to reasonable suspicion to stop a vehicle. See, e.g., United States v. Rocha-Lopez, 527 F.2d 476, 477-78 (9th Cir.1975), cert. denied, 425 U.S. 977 (1976) (where defendant's vehicle came to an unnecessary, sudden stop at an intersection and later, upon seeing a marked police car, suddenly braked down to about ten miles an hour, the reductions in speed were significant in establishing reasonable suspicion). In the context of this case, however, Figueroa's reduction in speed was in no way suspicious. Indeed, the situation is directly analogous to Hernandez-Alvarado, 891 F.2d 1414. In Hernandez-Alvarado, we held that the defendant's reduction in speed from 65 mph down to 55 mph upon seeing a marked police car did not create a reasonable suspicion to justify a stop of the vehicle. In so holding, we observed that "many law-abiding motorists ... reduce their speed on the freeway when being followed by a law enforcement vehicle." Id. at 1419.
 
 
 23
 Likewise, in this case, we cannot say that Figueroa's reduction in speed from 65 mph down to 55 mph in response to seeing a marked border patrol car driving directly adjacent to his vehicle was anything but a normal reaction under the circumstances. This conclusion is even more compelling in light of the fact that the posted speed limit on the freeway did in fact drop down to 55 mph within a few miles of the defendants' location at this time. Accordingly, we find that the agents were not justified in considering Figueroa's reduction in speed as a factor in establishing reasonable suspicion to stop their vehicle.
 
 C. Douglas, Arizona Vehicle Registration
 
 24
 The government further contends that the license check, which revealed that the Ford was registered to a person with a Spanish surname and an address in Douglas, Arizona, properly contributed to establishing reasonable suspicion to stop the vehicle. Agent Bangs testified at trial that this fact was significant because a lot of the narcotics seized on Interstate 10 come out of either Douglas or Naco, Arizona.[2]
 
 
 25
 It is true that an officer may consider the fact that a particular region is known for transportation of narcotics and aliens in determining whether there is reasonable suspicion to stop a vehicle. See, e.g., United States v. Sutton, 794 F.2d 1415, 1425-27 (9th Cir.1986). But, in the absence of other, substantially more probative and particularized considerations, an officer cannot stop a vehicle primarily because the vehicle is in a notorious narcotics or alien smuggling region.
 
 
 26
 In Hernandez-Alvarado, we addressed a situation in which a decision to stop a vehicle was based in part on the fact that: (1) the defendant's residence was in a neighborhood on the U.S.-Mexican border that was under investigation for narcotics activity; and (2) the vehicle had been purchased from a car dealership associated with drug trafficking. 891 F.2d at 1418. These two factors were viewed in conjunction with: (1) the nervous demeanor of both the driver and passengers and lack of eye contact with the officers; (2) the driver's reduction in speed from 65 mph to 55 mph when the patrol car pulled up alongside the defendant's vehicle; (3) the presence of a two-way antenna on the trunk of the vehicle; and (4) the large trunk capacity of the vehicle. Id. We held that, in light of the totality of the circumstances, the officers did not have reasonable suspicion that criminal activity was afoot. Id. at 1418-19. In so holding, we took note of the fact that many citizens with no connection to drug trafficking live near the border and purchase family vehicles at the same dealership. Id. at 1419.
 
 
 27
 Similarly, the fact that Figueroa and Escalante were travelling on a known drug smuggling route does not, without additional particularized factors, establish reasonable suspicion that criminal activity was afoot.
 
 D. Conclusion
 
 28
 We have consistently held that reasonable suspicion must be founded upon a particularized and objective basis before individuals may be stopped to determine if criminal activity is afoot. See, e.g., Rodriguez, 976 F.2d at 595. The factors cited by the government to sustain the district court's finding of reasonable suspicion are insufficient because they describe many individuals who may or may not have been involved in criminal activity.[3] Moreover, the totality of the circumstances did not justify an investigatory stop by the officers. Hence, the search by Agents Bangs and Stokes of the car in which Escalante was a passenger violated Escalante's fourth amendment rights and the fruits of that search must be suppressed. See United States v. Crews, 445 U.S. 463, 470 (1980).
 
 
 29
 Accordingly, the judgment and sentence of the district court are REVERSED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Figueroa was also arrested and charged under 21 U.S.C. §§ 846 and 841(a)(1). After the court's denial of his motion to suppress, Figueroa entered a conditional guilty plea and was sentenced to probation
 
 
 [2]
 The government does not articulate the significance of the fact that the car was registered to an individual with a Spanish surname
 
 
 [3]
 Under the government's theory, every young, Mexican-American male who drives a vehicle registered in a border town and does not "casually" react to and acknowledge the presence of border patrol agents, may be suspected of transporting narcotics or aliens