**UNITED STATES of America, Plaintiff,**

v.

**John Henry TURNER, Defendant.**

**Cr. No. 92–0453 MAG (WDB).**

United States District Court,
N.D. California.

March 2, 1993.

Jeffrey Nedrow, Sp. Asst. U.S. Atty., for plaintiff.

Laura V. Kerl, Law Offices of Laura V. Kerl, for defendant.

## ORDER AND OPINION

BRAZIL, United States Magistrate Judge.

Defendant John Henry Turner moves to suppress evidence seized subsequent to the stop and search of his vehicle and person. Mr. Turner argues that the National Park Service Ranger who detained him cannot articulate specific facts sufficient to support the reasonable suspicion of criminal activity that is necessary to justify the stop. Having heard proffers from both plaintiff and defendant, and having considered their written submissions, the court hereby GRANTS the motion to suppress. Because all of the incriminating evidence was developed after the unlawful stop, there is no basis for the prosecution to go forward. Since there is no evidentiary basis for the prosecution to go forward, the court hereby DISMISSES WITH PREJUDICE this action against Mr. Turner.

### I. Facts [1]

On June 21, 1992 at 6:18 P.M. Ranger Martini drove his marked vehicle on patrol in the Marin Headlands, part of the Golden Gate National Recreation Area in Marin County, California. He traveled up the road that leads to building # T1111, a 600 foot long structure at Fort Cronkhite. Although the government states that "neither the road leading to the building nor the building itself contain restrooms, picnic tables or other amenities for park visitors," and that "[t]he area around [the building] is not customarily frequented by visitor traffic," the Government has presented no evidence about the number or percentage of buildings and roads without such amenities in the Headlands, and makes no allegation that the area around building # T1111 is not open to the public for

---

1. The facts are taken from the Government's Opposition, the ranger's declaration attached to the Opposition, and the Information filed by the government. *See* Case File, *United States v. Turner,* CR No. 92–0453 (WDB). For the purposes of this motion, the facts asserted by the government are taken at face value. The defense, however, challenges and has not stipulated to the government's version of the facts. Should the court's ruling on this motion be reversed, the defense shall be permitted to cross-examine the government's witnesses about their perceptions.

driving or parking.[2]

Ranger Martini had previously observed several different kinds of violations of regulations in the area behind building # T1111, including unauthorized camping, drinking in vehicles, cultivation of marijuana, and engaging in sex inside vehicles.[3] Additionally, the Ranger knew that there had been a suicide in a car parked behind the building.[4]

As Ranger Martini drove around the building, he noticed Mr. Turner's parked car, occupied by two males.[5] The car started moving towards the patrol vehicle, according to the ranger, "as soon as the . . . occupants saw me."[6]

Ranger Martini waved to the driver to stop, but the driver, Mr. Turner, passed by and said through an open window, "We were just leaving."[7] The ranger then yelled at the car to stop, but, instead of stopping, Mr. Turner drove on, in an apparently lawful manner and without excessive or unreasonable speed.[8] Ranger Martini radioed an "eluding vehicle" report and continued driving around the building, whereupon he encountered Mr. Turner again, who had himself driven around the building, again in an apparently lawful manner and without excessive speed.[9] *Ranger Martini stopped and exited his vehicle.*[10] Turner stopped his car alongside and again stated "We were just leaving."[11] The Ranger looked down into the car and allegedly noticed that Mr. Turner's pants were unzipped and that the passenger "appeared to be underage," whereupon he decided to further detain the two for identification.[12]

The searches that followed this detention allegedly yielded the following results: (A) a hypodermic syringe that was in plain view on the floor in front of the passenger seat, (B) a passenger, 20 year-old Christian Smith, who was under the influence of heroin, (C) a woman's purse that was found under the seat of the vehicle, along with paraphernalia suitable for preparing heroin for injection and a glass "crack pipe," and (D) a loaded, apparently unchambered, semi-automatic pistol that was found in the trunk. Based on these discoveries, Mr. Turner was charged under the following provisions:

(1) 36 CFR 2.4(b), "Possession of Loaded Firearm in Vehicle."

(2) 18 U.S.C. § 662, "Possession of Stolen Property."

(3) 36 CFR 2.35(b)(2), "Possession of a Controlled Substance—Marijuana."[13]

## II. The Relevant Law

A seizure of a person occurs under the fourth amendment when that person yields to any official "show of authority" that

---

2. Government's Opposition to Motion to Suppress, *United States v. Turner*, CR No. 92–0453 (WDB), p. 2 (hereinafter "Opposition").

3. Opposition at 2.

4. Opposition at 2–3; Declaration in Support of Government's Opposition to Motion to Suppress, *United States v. Turner*, CR No. 92–0453 (WDB), at 2 (hereinafter, "Declaration"). Despite the imperfect verb tense of the statements concerning the officer's knowledge of the suicide in both the documents cited above, for the purposes of this motion the court assumes that the ranger knew about the suicide when he stopped Turner.

5. Opposition at 3.

6. Declaration at 2. There is no other evidence, however, that the occupants saw the ranger before the car moved, such as hurried movement in the car. Nor was there any reported activity in the car suggesting the type of illegal acts the ranger had previously observed behind the building. For the purposes of this motion, we accept as accurate the ranger's perception that defendant's vehicle was initially stopped and then began to move after and because of the ranger's appearance. The defense, however, contests the basis of the ranger's perception. *See* note 1, *supra.*

7. *Id.*

8. *Id.* at 2–3. There is no evidence that Mr. Turner violated any traffic regulations or otherwise drove abnormally.

9. *Id.* at 2.

10. *Id.* at 3.

11. *Id.* at 3.

12. *Id.*

13. The facts concerning the ranger's post-detention investigation and its results are compiled from the sources cited in note 1, *supra.*

a reasonable person would interpret as a command to restrict his or her movement. *California v. Hodari D.*, — U.S. —, —–—, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991). Such a seizure, and any subsequent search, must comport with the fourth amendment's prohibition of unreasonable searches and seizures, which "extends to seizures of the person, including the brief investigatory stop of a vehicle. Thus, an officer may not detain a motorist without a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992) (citations omitted). The officer must be able to point to "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the person detained is engaged in criminal activity." *United States v. Hernandez–Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989) (citation omitted).

 Evidence seized as a result of stop not supported by reasonable suspicion must be suppressed pursuant to a motion made by a defendant with proper standing. *See James v. Illinois*, 493 U.S. 307, 313, 110 S.Ct. 648, 652, 107 L.Ed.2d 676 (1990). When deciding whether an investigatory stop is supported by reasonable suspicion, the court must consider "the totality of the circumstances," *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), viewed from the perspective of the officer. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Reasonable suspicion is less than probable cause. *Rodriguez*, 976 F.2d at 594 (citations omitted). "'[T]he facts used to establish reasonable suspicion need not be inconsistent with innocence.'" *Id.* The court must examine all the factors articulated by the officer and evaluate "the degree of suspicion that attaches to [those] particular types of non-criminal acts." *Id.; Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989).

 At the time of the stop, the officer is entitled to assess the facts in light of his or her training and experience in detecting crime, *United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975), and to make "common sense conclusions about human behavior." *Sokolow*, 490 U.S. at 8, 109 S.Ct. at 1585 (citation omitted). Among the factors that an officer may articulate when asserting reasonable suspicion are: "the characteristics of the area in which [he or she encounters] a vehicle, ... usual patterns of traffic, recent [indications of ongoing illegal activity in the area], a driver's behavior, and aspects of the vehicle itself." *Hernandez–Alvarado*, 891 F.2d at 1416. "[S]ome of the[se] factors have been given lesser weight in contexts other than illegal alien smuggling." *Id.*

More specific factors that have been given weight include: the defendant's failure to acknowledge a law enforcement officer, *United States v. Franco–Munoz*, 952 F.2d 1055, 1057 (9th Cir.1991), or attempt to hide from the officer's view, *United States v. Nikzad*, 739 F.2d 1431, 1432 (9th Cir.1984), characteristics of a defendant's vehicle indicating that it is being used in a specific type of illegal activity, *Franco–Munoz*, 952 F.2d at 1057 (considering the fact that defendant's auto looked "heavily laden," as if it contained contraband in the trunk), a detailed pattern of activity by a defendant consistent with a specific type of illegal activity, *United States v. Sokolow*, 490 U.S. 1, 3, 109 S.Ct. 1581, 1583, 104 L.Ed.2d 1 (1989), and specific information that a crime has taken place combined with an officer's observations indicating that the defendant may have been the perpetrator, *Guam v. Ichiyasu*, 838 F.2d 353, 354–56 (9th Cir.1988).

 Unless there are specific indications that the suspects are engaged in criminal activity, an investigatory stop is not justified. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). In *Brown*, officers observed two men walking away from each other just as the officer's patrol car appeared in an alley that had a high incidence of drug traffic. Perhaps thinking the men had just met, or were about to meet for a drug transaction,[14] the officers detained them. The

---

**14.** The Ninth Circuit has attributed this motive to the officers in *Brown*. *See, Hernandez–Alvarado*,

Court found that the investigatory stop was not justified because "the appellant's activity was no different from the activity of other pedestrians in the neighborhood." *Id.* at 52, 99 S.Ct. at 2641. Additionally, the court noted that "[t]he fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal activity." *Brown,* 443 U.S. at 52, 99 S.Ct. at 2641.

Indeed, cases which have upheld a finding of reasonable suspicion have done so on the basis of relatively particularized information. Factors articulated by an officer may not be so few or mundane that "they describe too many individuals." *Hernandez–Alvarado,* 891 F.2d at 1418. The courts are keenly aware that "[a]t stake in th[ese] case[s] is the 'right of every person to the possession and control of his own person, free from all restraint of others, unless by clear and unquestionable authority of law.'" *U.S. v. Rodriguez,* 976 F.2d 592, 596 (9th Cir.1992) (citation omitted).

An instructive example of how much particularity is required to support a reasonable suspicion is found in *United States v. Hernandez–Alvarado,* 891 F.2d 1414 (9th Cir. 1989). Despite a proffer of several particular factors, the Ninth Circuit ruled that a stop that was made some eighteen kilometers from the Mexican border was not justified by reasonable suspicion. *Id.* at 1415–16. In addition to the border's proximity, the officer articulated six factors as the basis for reasonable suspicion: (1) the nervous demeanor of both the defendant and his passengers as they drove in their vehicle while the officer drove beside them; (2) the driver's post-surveillance reduction of speed from 65 to 55 m.p.h. in a 65 m.p.h. zone; (3) the presence of a two-way antenna on the trunk of the vehicle; (4) defendant's residence in a neighborhood on the U.S.—Mexican border which was under investigation for narcotics activity; (5) the license plate bracket on defendant's vehicle indicating that the car had been purchased from a dealership associated with drug trafficking; and (6) the large size of the car's trunk. *Id.* at 1416. The court concluded that, "[c]onsidered jointly, these factors are insufficient to justify an investigatory stop. While they may allow certain inferences to be drawn, they describe too many individuals to create a reasonable suspicion that the particular defendant is engaged in criminal activity." *Id.*

By way of illustrative contrast, two other relatively recent opinions offer some guidance as to the kinds of particularized articulations of factors that can be sufficient to support a finding of reasonable suspicion. In *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court, reversing a Ninth Circuit panel, held that officers had reasonable suspicion to stop the defendant on his return to the Honolulu airport when they "knew, *inter alia,* that (1) he paid $2100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage." *Sokolow,* 490 U.S. at 3, 109 S.Ct. at 1583. Here, the multi-faceted pattern of defendant's conduct was held to justify the suspicion that he had illegal drugs in his bags.

Somewhat similarly, in *Guam v. Ichiyasu,* 838 F.2d 353 (9th Cir.1988), the Ninth Circuit found reasonable suspicion where a police officer stopped a taxi carrying the defendant based on the following factors: (1) the officer had received several radio dispatches describing a hit and run accident, a description of the car involved, and the direction it was traveling; (2) the last of these indicated that the suspect vehicle had turned down Route 11, a dead-end road that terminated at a pier; (3) it was two o'clock in the morning; (4) the officer knew the dead-end road was non-residential and that sailors and power-

891 F.2d at 1417. *Brown,* however, states that the officers "did not claim to suspect appellant of any specific misconduct, nor did they have any reason to suspect that he was armed." *Brown,* 443 U.S. at 49, 99 S.Ct. at 2639.

plant workers were the only people likely to be present at that hour; and (5) when he reached the outlet of the dead-end road, minutes after the suspect car entered it, he noticed a taxi leaving the road which contained an elderly, well-dressed man in the back seat who did not acknowledge or look at the police car. *Ichiyasu*, 838 F.2d at 354. The court upheld the legality of the stop, noting that the Ninth Circuit "has upheld investigatory stops where facts known to the police make apparently innocuous behavior suspicious to the police." *Id.* at 356. Where an officer has information that a specific crime has taken place, and the defendant seems a likely suspect based on that information combined with other perhaps innocuous behavior, an investigatory stop is reasonable. *See also, United States v. Bautista*, 684 F.2d 1286 (9th Cir.1982) (holding that robbery suspects found on likely escape route, meeting description of robbers and dressed inappropriately for the weather may be stopped) *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983).

█ As this review of authorities indicates, the courts address each case in the specific totality of circumstances that it presents, but generally have required a relatively high degree of particularity to justify an investigatory stop. Observations leading to an "inchoate hunch" that some kind of criminal activity is afoot are insufficient to justify detention, *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), and the Fourth Amendment is not satisfied if the factors articulated would cast too wide a net over persons likely to be engaged only in lawful activity.

It is against this background that we must consider the dictum in the footnote in *California v. Hodari D.*, —— U.S. ——, —— – ——, n. 1, 111 S.Ct. 1547, 1549 n. 1, 113 L.Ed.2d 690 (1991) that the government contends strongly supports the conclusion that the stop in the case at bar by Ranger Martini was supported by reasonable suspicion. In *Hodari*, two plain-clothes police officers were patrolling in an unmarked car, wearing jackets embossed with "Police" on both front and back. *Id.* —— U.S. at ——, 111 S.Ct. at 1549. As they rounded a corner, they saw four or

five youths, including Hodari, huddled around a car on a street in Oakland that all parties apparently conceded was in a "high crime" area. *Id.* When the youths saw the officers' car approaching, they fled "in panic." *Id.* —— U.S. at —— n. 1, 111 S.Ct. at 1549 n. 1. Hodari ran through an alley, emerged on 62nd Avenue and ran north, looking behind himself as he ran. *Id.* One of the officers, meanwhile, had guessed Hodari's escape route and was running south on 62nd. *Id.* He subsequently tackled Hodari, shortly after Hodari jettisoned what turned out to be some "crack" cocaine. *Id.*

Because the State of California had conceded that the arresting officer did not have reasonable suspicion to stop Hodari solely because Hodari had broken into a run when he saw the two police officers approach, the issue that the Supreme Court resolved in this opinion was whether Hodari had been "seized" within the meaning of the Fourth Amendment by virtue of the officers' pursuit of him. Despite the fact that the issue of reasonable suspicion was not before the Court, Justice Scalia's opinion included a footnote questioning the concession by the State of California on the reasonable suspicion issue:

> California conceded below that Officer Pertroso did not have the "reasonable suspicion" required to justify stopping Hodari. That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ("The wicked flee when no man pursueth"). We do not decide that point here, but rely entirely upon the State's concession.

*Id.* —— U.S. at n. 1, 111 S.Ct. at n. 1 (citation omitted).

For reasons we suggest below, we have serious reservations about the suggestion in this footnote that apparent flight, by itself, is sufficient to support the reasonable suspicion that is necessary to justify an investigatory stop. But before we turn to that broader issue, it is important to point out the many ways in which the case at bar is materially

different from the situation faced by the officers in *Hodari D.*

### III. The Facts of this Case are Materially Different from the Facts in *Hodari D.*

■ We note first that the Government has not proffered sufficient evidence to justify characterizing the area of the Marin Headlands where Ranger Martini encountered defendant as a "high crime" area. There is a substantial difference between the Headlands, a largely undeveloped and unpopulated part of the Golden Gate National Recreation Area, and the intersection of 63rd and Foothill in Oakland (where the police encountered Hodari D.), or the alley in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). While we accept for purposes of ruling on this motion the proffer by the government that Ranger Martini knew that there had been some illegal activity in the area where he encountered defendant and his vehicle, we reject the suggestion that because some illegal activity had occurred there the area can be characterized as "high crime". We note that the government's proffer did not indicate when or how often the alleged criminal activity had occurred near Building # T1111. For all we can tell from the government's proffer, the incidence of illegal activity in the area was extremely rare and sporadic. We have no basis for inferring that a substantial percentage of the users of the area in question engaged in any unlawful activity whatsoever. Nor was most of the activity that had allegedly occurred in that vicinity sometime in the past of an especially serious or socially destructive character (e.g., unauthorized camping and sex in a vehicle). The fact that some unspecified amount of unlawful activity had occurred at some unspecified times in the past in the vicinity of building # T1111 distinguishes that area from too few places on our planet to be of much significance, and certainly falls far short of justifying the label "high crime area."

■ The Marin Headlands is a relatively rural National Recreation Area. By National Park Service policy it is a place set aside for persons to explore. The government encourages people to go there simply to enjoy the beauty and the relative isolation and solitude of the environment. The fact that there are no restrooms or picnic tables in the area hardly helps support an inference that people who are there are engaged in criminal activity. It is the very absence of restrooms and picnic tables that helps define the special and attractive character of such areas as retreats from the every day pressures of life; the underdevelopment exists as a matter of public policy in order to attract persons to a different kind of place, a place where they can find a different kind of peace with nature. Thus the absence of standard "amenities" and of frequent traffic or visitors simply are not the kind of particularized factors that can lend any support to an inference of wrongdoing. Moreover, we note that there is a road into the area, that defendant was lawfully using that road, and that the government has not even intimated that defendant's presence in this area was in violation of any regulation or policy.

There are additional important differences between the events leading up to the seizure in *Hodari* and the stop in the instant case. Upon sighting the police officers, Hodari fled in panic, racing down an alleyway between streets, first west, then north, all the while looking behind him for his pursuers. Thus there was no question that he was in full bore flight from the moment he first saw the officers.

The events leading up to detention in this case were much different. While Ranger Martini believed that Turner's vehicle started to move as soon as its occupants saw him,[15] that movement cannot be characterized either as "flight" or as accompanied by "panic". Mr. Turner, by the government's proffer, drove *toward* the officer, apparently at a slow speed and in a perfectly lawful manner. When the ranger waved to Mr. Turner, intending to direct Mr. Turner to stop, Turner acknowledged the officer's pres-

---

**15.** For the purposes of this motion, the court accepts the temporal sequence of events as described by the ranger, as well as the ranger's perception that the movement was caused by his presence. *See* note 1, *supra.* Defendant does not concede that he began driving the car only when and because he saw the officer.

ence, addressed the officer directly through an open car window, explained that he was "just leaving," and drove on, all apparently at a slow speed.

While Turner did not stop his vehicle even after the officer yelled a command to stop, he also did not speed away. Instead, Turner drove his car around the building, apparently at an unremarkable rate of speed, and approached the officer's vehicle a second time. Again he interacted with the ranger (instead of ignoring him or speeding off); in fact, he yielded peacefully and without furtive gesture when the ranger got out of his vehicle and indicated that Turner should stop.[16] If this were *Hodari D.*, Turner would have sped past the officer, who was out of his vehicle, and fled the scene.

Thus there are very significant differences between our case and *Hodari D.* not only with respect to the settings in which the police encountered the defendants, but also with respect to the behavior of the defendants. In *Hodari D.* the defendant's conduct, at least as described by the police and Justice Scalia, was unequivocal in character: it consisted of pell-mell flight, an all-stops out effort to avoid any contact with the police. Mr. Turner's conduct, by contrast, was, at worst, equivocal. He squarely acknowledged the officer. He did not flee the scene. He did not speed away. He drove in an orderly, lawful manner, returning to re-encounter the officer.

Another important difference between our case and *Hodari D.* relates not to the character of the conduct itself, but to possible explanations for it. Justice Scalia apparently assumed there was only one possible explanation for the pell mell flight of Hodari (criminal culpability). Why Justice Scalia ignored the possibility that these young black men ran because they were afraid of the police, or afraid of being wrongly accused, is something of a mystery. The point here, however, is that while we perceive only two likely explanations for the unequivocal act of flight by Hodari (culpability or innocent fear), the circumstances in which Ranger Martini encountered Mr. Turner should have

suggested to the officer another explanation for Mr. Turner's equivocal behavior, an explanation that, on the face of things, we think should have been viewed as more likely than culpability.

That explanation is that Mr. Turner mistakenly assumed that he had driven his car into a part of the park where he was not authorized to have done so. There was a road into the area and it was not posted with signs declaring it off limits, but it was in a fairly obscure part of the park that was not used frequently and in which there were no amenities, e.g., no picnic tables or restrooms. In this setting, consider Mr. Turner's behavior, as perceived by the ranger: he started his car when he saw the ranger, then drove toward the ranger at a normal rate of speed and in an unremarkable manner, acknowledged the ranger, then said, through his open car window "We were just leaving." After not stopping when first directed to do so, Mr. Turner did not speed off, but, instead, drove in an unremarkable way around the building and up to the officer for a second time, on this occasion yielding to the unequivocal signal to stop. The most likely explanation for this pattern of behavior is not participation in some clearly criminal conduct, but apprehension (completely misplaced, as it turns out) by Mr. Turner that he had ended up in some part of the park with his car where he was not supposed to be and that he was about to be run out by the ranger. Since that is the first (most obvious) explanation for Mr. Turner's conduct that should have occurred to the ranger, and since that explanation was completely consistent with innocence of any wrongdoing (after all, Mr. Turner had a perfect right to be where he was, even if he was not confident about that right), it was not reasonable, given all the circumstances (most specifically, the absence of any other conduct that was incriminating in this setting) to infer that his behavior indicated that he was engaged in illegal activity.

For all the reasons set forth above, including the differences in the settings, the differences in the conduct, and the differences in

---

16. Under *Hodari,* it is at this point that seizure occurred, before any of the observations that led the ranger to continue Turner's detention. —— U.S. at ——–——, 111 S.Ct. at 1551–52.

the obvious possible explanations for the conduct, we hold that footnote 1 of *Hodari D.* does not compel the conclusion that the stop in the case at bar was reasonable. In fact, the differences between the circumstances presented in the two cases are so material that we would find the footnote of very little analytical value even if it were more than dictum.

### IV. Further Analysis of the Proffered Facts in Light of the Applicable Law

However fortuitous its results, Ranger Martini's investigatory stop of Mr. Turner was unreasonable under the Fourth Amendment. In reaching this conclusion we have evaluated the totality of circumstances surrounding the stop in light of Ranger Martini's knowledge at the time of the stop. He knew that various violations had occurred behind building # T1111, and that visitor traffic in the area was not "frequent." When he came around the corner, he saw Turner's car start into motion.[17]

There is no evidence of panic or even of conduct that can fairly be characterized as "flight" in this case. At worst, Mr. Turner's conduct, viewed as a whole, was equivocal and not immediately responsive to the officer's *unlawful* command to stop (that first command to stop, to which it appears Mr. Turner did not yield, clearly was unlawful; no argument could be made in good faith that the ranger, at that early juncture, could articulate particular facts that would support a reasonable suspicion of illegal activity; the only things that had happened at that point were that the ranger had come upon the vehicle in a place where it was perfectly lawful to be, and that when the driver saw the ranger he began to drive his car in a lawful manner).

Turner was legally parked, took no action that suggested he was involved in any of the violations that Ranger Martini had previously observed in the area, drove *towards* the patrol vehicle *twice,* clearly acknowledged the officer's presence, explained his movement, and drove away in an apparently legal manner. Additionally, there were no characteristics of Mr. Turner's car that suggested illegal activity, the Ranger was not acting on information that a crime had taken place, and the incident happened during daylight in a public recreation area.

Summarizing the factors the government has offered to support the stop, we are left with the following: (1) the ranger knew that some unlawful activity had occurred in this area before; (2) the area was more remote than other places in the Headlands; (3) Turner's car appeared to start moving in response to the patrol vehicle's presence; (4) Turner's explanation for the movement of his vehicle, "We were just leaving," did not satisfy the ranger's curiosity about what Turner was doing when he was parked; and (5) Turner did not initially stop when yelled at.

 This is not enough. Vaguely "suspicious" activity in a remote area where some unlawful conduct has previously taken place will not justify an investigatory stop. *Brown,* 443 U.S. 47, 49, 52, 99 S.Ct. 2637, 2639, 2641; *Thompson v. Reuting,* 968 F.2d 756, 759 (8th Cir.1992). The factors articulated by the government describe "too many individuals," especially in a public outdoor recreation area. *Hernandez–Alvarado,* 891 F.2d at 1418. For reasons set forth earlier in this opinion, we can ascribe very little weight to factors (1), (2), and (4) in the setting of this case. Factors (3) and (5) could lend some support to a vague suspicion either of illegal activity or of mistaken apprehension that illegal activity might be charged, but vague suspicion clearly does not satisfy the Fourth Amendment.

---

17. Though the government's brief characterizes the movement of Turner's car as "evasive action" and "unusual conduct," Opposition at 8, it does not identify evidence or law that supports this characterization. The government cites *United States v. Smith,* 799 F.2d 704, 707 (11th Cir. 1986) for this proposition. The *Smith* quote, however, is taken out of context. In fact, the arresting officer in *Smith* did *not* establish reasonable suspicion. The entire context of the language quoted in the Government's Opposition reads as follows: "[Officer] Vogel's suspicion therefore was *not* the result of 'reasonable inferences' from 'unusual conduct,' but *was instead a classic case of those 'inarticulate hunches' that are insufficient to justify a seizure under the fourth amendment."* *Id.* (emphasis added).

Moreover, we cannot endorse doctrine in which citizens are penalized (by loss of constitutional protections) for insisting that nonconsensual invasions of their freedom by police be justified in conformity with constitutional norms. Stripped to its essence, what happened in this case is this: the ranger attempted to stop a citizen whom the ranger had no constitutional right to stop; the citizen chose to exercise his right not to stop; the ranger then relied on the citizen's exercise of that right to attempt to justify the second effort to stop the citizen, an effort to which the citizen yielded. The protections of the Fourth Amendment would be wholly eviscerated if the courts were to hold that a citizen's refusal to consent to an unlawful detention could serve as a sufficient basis for reasonable suspicion of unlawful activity, thus justifying a nonconsensual stop. Such a doctrine would make a mockery of the concept of consent itself. It also would make a mockery of the requirement of reasonable suspicion, because under such a doctrine the police could command citizens to stop with impunity and without any basis for any suspicion whatsoever, and then could make a lawful stop as soon as the citizen declined to heed the original unlawful command. To understate the matter, we should be reluctant to endorse doctrine under which lawful responses by citizens to unlawful conduct by police would justify loss of precious freedoms.

## V. Conclusion

The defendant's motion to dismiss is GRANTED. Because the granting of defendant's motion requires suppression of the evidence acquired after and as a result of the unlawful stop, and because without that evidence there is insufficient evidence to support this prosecution, this matter is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.