# Assistance by State and Local Police in Apprehending Illegal Aliens

Subject to the provisions of state law, state and local police may constitutionally detain or arrest aliens for violating the criminal provisions of the Immigration and Naturalization Act.

State and local police lack recognized legal authority to stop and detain an alien solely on suspicion of civil deportability, as opposed to a criminal violation of the immigration laws or other laws.*

State and local police may detain aliens reasonably suspected of a criminal violation of the immigration laws for periods of as long as 45 to 60 minutes when detentions of that length are necessary to allow for the arrival of Border Patrol agents who are needed for the informed federal disposition of the suspected violations.

February 5, 1996

MEMORANDUM OPINION FOR THE UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF CALIFORNIA

## I. BACKGROUND AND SUMMARY OF CONCLUSIONS

This responds to your memorandum to Seth Waxman, Associate Deputy Attorney General. In that memorandum, you requested a legal opinion from this Office concerning the circumstances in which state and local police in California can assist the Immigration and Naturalization Service ("INS") in enforcing the federal immigration laws.

Your request for opinion was triggered by certain difficulties that have arisen in connection with local law enforcement assistance in the immigration area, particularly in detaining aliens who have entered the United States unlawfully. In particular, you referred to a policy of the San Diego Police Force that limits the period for which its officers may detain alien suspects stopped on "reasonable suspicion" to a maximum of 20 minutes. Although state and local police have been authorized to detain alien suspects in some circumstances, the proper investigation, processing, and arrest of suspected immigration violators generally requires the presence and assistance of agents of the United States Border Patrol. At present, however, we understand that local police will detain such persons for only 20 minutes after Border Patrol assistance is requested. You advise that Border Patrol agents in your district are rarely able to reach the scene of apprehension within 20 minutes. As a result, the 20-minute detention limit may cause state officers to release illegal alien entrants when Border Patrol agents have not arrived at the scene within that time period. You have therefore suggested that city and county authorities consider expanding the permitted period of detention from 20 minutes to as much as one hour, as permitted by law.

---

* Editor's Note: See Editor's Note to Section II.B.

26

In addition to the matters raised in your initial opinion request, you have subsequently requested our legal opinion on several additional related issues. Set forth below is our analysis of those issues. Our conclusions on the chief issues you raise may be summarized as follows:

1. Subject to the provisions of state law, state and local police [1] may constitutionally detain or arrest aliens who have violated the criminal provisions of the Immigration and Naturalization Act ("INA"). State police lack recognized legal authority to arrest or detain aliens solely for purposes of *civil* deportation proceedings, as opposed to criminal prosecution. (Sections II.A-B).*

2. California law allows state police to enforce the criminal provisions of federal immigration law, although they may not make warrantless arrests for INA misdemeanor violations unless the offense occurs in their presence. When illegally entering aliens have reached a place of repose within the United States, the offense is completed and is no longer subject to warrantless arrest by California police. (Sections II.A, II.C3).

3. State police may stop and detain carloads of illegal alien suspects only in circumstances that satisfy the requirements of "reasonable suspicion." These requirements are inherently fact-specific and therefore not readily reduced to clearcut rules. Nonetheless, several basic principles and considerations warrant emphasis. (Section II.C).

a. Persons may be detained for reasonable periods by state police on the basis of a reasonable suspicion of a criminal immigration law violation. The critical requirement for a reasonable suspicion detention is the existence of objective, articulable facts suggesting the commission of a criminal offense by the persons detained, rather than mere stereotypical assumptions, profiles, or generalities.

b. In particular, absent knowledge of an established federal policy of not prosecuting such offenses, state police may, in our opinion, legally detain alien suspects for disposition by federal agents when there is reasonable suspicion that the suspects have violated or are violating the two commonplace misdemeanor provisions of the INA, 8 U.S.C. § 1304(e) (lack of alien registration documents) or § 1325 (illegal entry), or other criminal provisions of the INA.

c. Written guidelines or policies adopted by state or local police forces may generate additional legal complications regarding otherwise valid detentions based on suspected violations of criminal immigration laws, insofar as such guidelines or policies state that suspects may only be detained based on reasonable suspicion of crimes that are unrelated to the immigration laws. Because any extended detention of a suspect must generally be based upon the law enforcement purposes served by the stop, a police force's official disclaimer of any immigration-related detention authority could undermine the validity of detaining suspects to await processing by Border Patrol officers.

---

* Editor's Note: See Editor's Note to Section II.B.

[1] For purposes of brevity, state and local police will sometimes be referred to herein simply as "state police."

4. Under governing judicial precedents, state police in California may constitutionally detain alien suspects for periods of as long as 45 to 60 minutes in circumstances where detentions of that length are *necessary* to allow for the arrival of Border Patrol agents (exercising due diligence) who are needed for the informed federal disposition of reasonably suspected violations of the INA. (Section II.D).

a. We caution, however, that one Ninth Circuit panel opinion issued in 1994 suggests a somewhat more restrictive approach to the permissible duration of such detentions.

b. If the Border Patrol agents do not promptly arrest the suspects upon their arrival at the scene of a reasonable suspicion detention, it must be assumed that the additional period of detention required by them before effecting an arrest would be counted by a court in calculating the permissible length of such detentions (e.g., a permissible 40-minute detention by state police awaiting the arrival of Border Patrol agents might be rendered impermissibly lengthy if the agents detain the suspects for, e.g., an additional 30 minutes before effecting an arrest).

5. As a general rule, the involuntary vehicular transportation of validly detained aliens by state police to Border Patrol agents would be deemed an arrest and require probable cause rather than mere reasonable suspicion. (Section II.E).

a. In unusual circumstances where the Border Patrol's necessary assistance may be more promptly obtained by transporting validly detained suspects to the agents than by awaiting the arrival of the latter, we believe such transportation (limited to reasonably proximate locations) would be sustainable even in the absence of probable cause under the principles applied in several pertinent judicial opinions in California and the Ninth Circuit. It cannot be assumed, however, that all reviewing courts would uphold the validity of such involuntary transportation in the absence of probable cause.

b. Interrogation undertaken by Border Patrol agents following such localized transport of detainees should take place in an open, non-coercive setting; interrogation of such transported detainees inside a Border Patrol office or other police office would likely transform the detention into an arrest under controlling judicial precedents.

6. Under one recent Ninth Circuit precedent, the question whether state police may validly arrest alien suspects on probable cause that they have violated the INA's requirement that aliens carry registration documents, *see* 8 U.S.C. § 1304(e), may also depend upon whether they have reason to believe that federal officials *actually prosecute* suspects for such violations. This is significant because that misdemeanor provision may sometimes provide the only basis for the arrest. To the extent that arrests by California police nominally based on such INA misdemeanor charges are found to be a pretext for civil deportation proceedings, they are likely to be invalidated by the courts. (Section II.C.2).

7. There is established statutory authority for the deputation of state law enforcement officers as Deputy United States Marshals. This mechanism has been most commonly used to allow state officers to perform federal enforcement functions

in joint federal-state law enforcement task forces (e.g., anti-drug and fugitive pursuit task forces). (Section II.F).

a. Where the Attorney General has exercised her authority to delegate supplemental INA enforcement duties to the U.S. Marshals Service, state and local officers can be specially deputized as Special Deputy United States Marshals in order to perform supportive federal immigration enforcement functions.

b. Such arrangements were previously authorized by an Attorney General Order in August 1994, for a period of one year, in order to deal with a potential mass immigration emergency in the State of Florida.

## II. ANALYSIS

### A. *Validity and Scope of State Police Participation in Enforcing Federal Immigration Laws*

It is well-settled that state law enforcement officers are permitted to enforce federal statutes where such enforcement activities do not impair federal regulatory interests. *Ker v. California*, 374 U.S. 23 (1963); *Florida Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963). This general principle extends to state enforcement of the Immigration and Naturalization Act as well. In *Gonzales v. City of Peoria*, 722 F.2d 468 (9th Cir. 1983), for example, the Ninth Circuit held that "federal law does not preclude local enforcement of the criminal provisions of the [Immigration and Naturalization] Act." *Id.* at 475.

At the same time, federal law does not *require* state law enforcement agencies to assist in enforcing the INA. That the INA permits state police officers to make arrests and detentions, *see, e.g.*, 8 U.S.C. § 1324(c), does not mean that states must permit their police to do so. Rather, the INA enforcement authority of state police is subject to the provisions and limitations of state law.

In *People v. Barajas*, 81 Cal. App.3d 999, 147 Cal. Rptr. 195 (1978), the California Court of Appeal upheld the authority of California local police officers to make arrests for violations of 8 U.S.C. § 1325 (the illegal entry misdemeanor) and § 1326 (felony for alien to re-enter United States after deportation). In rejecting the defendant's argument that the arrest was illegal under INA warrant requirements, *see* 8 U.S.C. § 1357, the court determined that those requirements applied only to arrests by federal officers and then stated: "In the absence of a specific [federal] law regulating the mode of such an arrest, the legality of an arrest by local officers is determined by the law of arrest of the state in which it occurs, unless such law conflicts with the federal Constitution." 81 Cal. App.3d at 1006. Upholding the arrest under the "reasonable cause" standard of section 836 of the California Penal Code, the court stated:

> [The state officers'] knowledge of defendant's evasive conduct (use
> of a false name, claim to possession of a "green card" not on

> hand but at home, and lack of knowledge as to allow production of the card) during the April 28 incident, coupled with [the INS officer's] information, gave them ample probable cause to arrest for violation of 8 U.S.C. section 1325 or 1326.

*Id.* at 1007.

A 1984 opinion of the California Attorney General also concluded that neither federal nor California law bars state and local officials from assisting in the enforcement of federal immigration laws. *See* 67 Ops. Cal. Atty. Gen. 331, Opinion No. 83–902 (July 24, 1984). The opinion stated that, in the absence of federal statutory restrictions on such activity, "we would look to California law to determine the role state and local officials in California may play in that regard." *Id.* The opinion's central conclusion was that there is no legally enforceable *requirement* that California peace officers must report to the INS knowledge they might have concerning persons who have entered the United States illegally, although there is no prohibition against their doing so. More pertinently, the Attorney General's opinion did point out one particularly significant restriction of California law on INA enforcement by local police. In the case of *misdemeanor* violations, such as those covered by 8 U.S.C. §§ 1304(e) and 1325, an arrest may only be made when the officer has reasonable cause to believe that the person has committed the offense "*in his presence.*" 67 Ops. Cal. Atty. Gen. 331 n.10–11; Cal. Penal Code § 836 (emphasis added).

Subject to such restrictive state law provisions, it is recognized that state and local police may stop, detain, and arrest persons when there is reasonable suspicion or, in the case of arrests, probable cause that such persons have violated, or are violating, the federal immigration laws. *Gonzales*, 722 F.2d at 474; *Barajas*, 81 Cal. App.3d at 999; 67 Ops. Cal. Att'y Gen. 331, Op. No. 83–902.

We also note that the INA itself recognizes the authority of state officers to make arrests for criminal violations of federal immigration law. For example, 8 U.S.C. § 1324(c), governing the authority to arrest persons for bringing into the United States or harboring illegal aliens, provides as follows:

> No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, *and all other officers whose duty it is to enforce criminal laws.* [emphasis added]

Moreover, in *Gonzales*, the Ninth Circuit explicitly rejected the claim that this state arrest authority does not extend to other criminal provisions of the INA, such as 8 U.S.C. §§ 1325 and 1326. *See* 722 F.2d at 475. The California Court of Appeal reached the same conclusion in *Barajas*. *See* 81 Cal. App.3d at 1006.

## B. *Civil Enforcement/Deportable Aliens* \*

Whether state officers may assist in enforcing the *civil* component of federal immigration law raises a separate issue. Deportation of aliens under the INA is a civil proceeding. For example, a lawfully admitted non-immigrant alien may become deportable if his visitor's visa expires or if his student status changes. In such circumstances, persons may become subject to civil deportation without having violated a criminal provision of the INA.

In *Gonzales*, the Ninth Circuit held that the authority of state officials to enforce the provisions of the INA "is limited to criminal violations." 772 F.2d at 476. The court based this distinction between the civil and criminal provisions of the INA on the theory that the former constitute a pervasive and preemptive regulatory scheme, whereas the latter do not. [2] Application of this rule would seem to preclude detentions by state officers based solely on suspicion of deportability (as opposed to *criminal* violations of the INA). *Accord Gates v. Superior Court*, 193 Cal. App.3d 205, 213, 238 Cal. Rptr. 592 (1987) ("The civil provisions of the INA constitute a pervasive regulatory scheme such as to grant exclusive federal jurisdiction over immigration, thereby preempting state enforcement.").

In an opinion issued in 1989, [3] this Office similarly recognized the distinction between the civil and criminal provisions of the INA for purposes of state law enforcement authority. We first expressed our belief that "the mere existence of a warrant of deportation for an alien does not provide sufficient probable cause to conclude that the criminal provisions [of the INA] have in fact been violated." 1989 OLC Op. at 8. We then concluded:

> Because 8 U.S.C. § 1251 makes clear that an alien who has lawfully entered this country, lawfully registered, and who has violated no criminal statute may still be deported for noncompliance with the noncriminal or civil immigration provisions, the mere existence of a warrant of deportation does not enable all state and local law enforcement officers to arrest the violator of those civil provisions.

*Id.* at 9.

---

\* Editor's Note: In 2002, the Office of Legal Counsel withdrew the advice set forth in this section.

[2] As the court stated:

We assume that the civil provisions of the Act regulating authorized entry, length of stay, residence status, and deportation, constitute such a pervasive regulatory scheme, as would be consistent with the exclusive federal power over immigration. However, this case does not concern that broad scheme, but only a narrow and distinct element of it—the regulation of criminal immigration activity by aliens.

722 F.2d at 475.

[3] Memorandum for Joseph R. Davis, Assistant Director, Federal Bureau of Investigation, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Handling of INS Warrants of Deportation In Relation to NCIC Wanted Person File* at 5 (Apr. 11, 1989) ("1989 OLC Op.").

In that regard, 8 U.S.C. § 1357(a)(2) imposes substantial restrictions even upon the authority of *federal* officers to make warrantless arrests for purposes of civil deportation. It requires that the arresting officer reasonably believe the alien is in the United States illegally and that he is "likely to escape before a warrant can be obtained for his arrest." *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (asserting that even INS agents have no legitimate basis for a warrantless arrest of aliens subject to civil deportation unless the arresting officer reasonably believes that the alien is likely to escape before an arrest warrant can be obtained).

Taking all these authorities into account, we conclude that state and local police lack recognized legal authority to stop and detain an alien *solely on suspicion of civil deportability*, as opposed to a criminal violation of the immigration laws or other laws.

## C. *Legal Authority and Standards for Detention or Arrest of Alien Suspects*

You have also asked for our opinion concerning the legal standards governing the detention of suspected illegal aliens under the circumstances most commonly confronted by police in the San Diego area. As an illustrative example of such circumstances, you have described the situation where a van or other vehicle carrying a number of possible illegal aliens is stopped by the police based on probable cause or reasonable suspicion that a state traffic violation or other criminal offense has been committed. [4] Although such circumstances clearly justify detention and processing of the driver and vehicle, the question arises as to what quantum or quality of indicators are necessary to sustain arrest or investigative detention of the alien passengers on the respective grounds of probable cause or reasonable suspicion. Additional issues concern the particular criminal provisions of the INA that may provide a valid basis for detention or arrest of alien suspects.

### 1. *General Principles and Permissible Considerations*

Courts have made clear that federal and state officers have authority briefly to detain persons based on reasonable suspicion that they have committed or are committing a violation of federal law, including the immigration laws. *See, e.g., Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987) ("[T]o detain a worker short of an arrest, an INS officer must have an objectively reasonable suspicion that the particular worker is an illegal alien."). The general standards governing reasonable suspicion detentions of aliens transported in vehicles were recently summarized by the Ninth Circuit in *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (1994):

---

[4] We note that where state officials establish a fixed checkpoint for purposes of detecting illegal entry and related crimes, vehicles may be stopped for brief questioning even in the absence of any reasonable or individualized suspicion. *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). The operation of such fixed checkpoints need not be authorized in advance by a judicial warrant, *id.* at 564–66, and need not be in immediate proximity to the national border (the checkpoint upheld in *Martinez-Fuerte* was 66 miles north of the Mexican border).

Reasonable suspicion is not a mere phrase but has been given meaning such that suspicion is "reasonable" only if based on "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle contains aliens who may be illegally in the country." [quoting from *United States v. Brignoni-Ponce*, 422 U.S. at 884]

For example, the Ninth Circuit upheld a state officer's reasonable suspicion detention of alien passengers in a parked vehicle in *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989). There, a Los Angeles police officer observed a parked van occupied by two men in the front seat and a number of others in the rear who appeared to be Hispanic males. Merchants in the area had previously reported suspicious activity around this van, notably the extensive comings and goings from the van after it would park on the street after 6 p.m., when the local patrolman would be off duty. The detaining officer was also aware that there was considerable heroin dealing in the area in question. The officer approached the van, noticed a list of names and numbers on the van's visor, and elicited a response from one of the passengers that he had recently crossed the U.S.-Mexico border and had paid money to be illegally transported into the United States. The officer then detained the van's occupants while he contacted the INS. The court upheld the detention against a challenge that it was not based upon a reasonable suspicion of illegal activity. *Id.* at 1394. Citing the circumstances described above, the court stated: "Taken together, these factors provide a founded suspicion that the occupants of a van fitting the description of appellant's van may have been engaged in illegal activity." *Id.* Significantly, the court did not find it necessary to establish that the officer had any particular *felony* violation in mind when he formed his reasonable suspicion.

In assessing alien detention issues, it must also be recognized that when police stop a vehicle on the basis of traffic offenses or other suspected crimes they may not ordinarily detain the vehicle's passengers beyond the period required for disposition of the matter that justified the initial stop. *See Martinez*, 831 F.2d at 827. However, observations made while investigating or processing the primary offense may provide independent basis for reasonable suspicion that either the driver or the passengers are violating the federal immigration laws, which would then justify further detention to investigate such violations within the bounds permitted by *Terry* and its progeny. *See United States v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993), *cert. denied*, 511 U.S. 1134 (1994).[5] Moreover, police would be permitted to inquire as to the immigration status of passengers in such a stopped vehicle as long as they do not unnecessarily prolong the length of the

---

[5] *See also United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994), *cert. denied*, 514 U.S. 1113 (1995), where the court held, "If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'" (citation omitted). The same reasoning would apply when a traffic stop leads to a reasonable suspicion that the vehicle is carrying illegal aliens.

initial detention for that purpose. The responses to such inquiries could then provide a basis for detention or arrest of the passengers by creating a reasonable suspicion or probable cause that they have committed an illegal entry or are aliens lacking proper registration documents.

Courts have also recognized that a reasonable suspicion created by one person may also support a reasonable suspicion as to others accompanying him in appropriate circumstances. Thus, the "traveling companion of a person whom the police reasonably suspected of illegally crossing the border" may also be detained on reasonable suspicion when there are indications that the accompanying individuals are acting in concert or complicity with the initial suspect. *See United States v. Tehrani*, 49 F.3d 54, 59–60 (2d Cir. 1995); *United States v. Patrick*, 899 F.2d 169, 172 (2d Cir. 1990). It follows that when state police have reasonable suspicion that a stopped driver may be engaged in transporting illegal aliens, a reasonable suspicion of related immigration violations may also be justified as to his passengers.

Reasonable suspicion determinations are based on the totality of circumstances in each case and are "not readily reduced to 'a neat set of legal rules.' " *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989). Reliable predictions of judicial rulings in this area are especially difficult within the Ninth Circuit, where different panels have reached inconsistent conclusions in applying the reasonable suspicion standard to extremely similar factual situations. *Compare United States v. Franco-Munoz*, 952 F.2d 1055 (9th Cir. 1991), *cert. denied*, 509 U.S. 911 (1993) (reasonable suspicion upheld where heavily-laden vehicle driven by male of Hispanic appearance was traveling in area known for alien smuggling) *with United States v. Rodriguez*, 976 F.2d 592 (9th Cir. 1992), *amended*, 997 F.2d 1306 (9th Cir. 1993) (similar fact pattern held *insufficient* to support reasonable suspicion). Nonetheless, we believe several general principles are both relevant and well-established in the caselaw as guidelines for the permissibility of stops and detentions of vehicles or their passengers in this context:

a. Reasonable suspicion must be based upon an "objective basis" and "specific, articulable facts," rather than on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person . . . ." *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995). These specific, articulable facts must provide "a rational basis for separating out the illegal aliens from American citizens and legal aliens." *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir. 1985).

b. Officers may not arbitrarily stop all persons of Mexican or Hispanic appearance (or that of any other particular nationality or ethnic group) to question them regarding immigration/citizenship status without any other specific grounds for reasonable suspicion that they are illegal aliens. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Hernandez-Alvorado*, 891 F.2d at 1416. Likewise, Hispanic or foreign-sounding names do not in themselves provide a valid basis

for reasonable suspicion. *See Orhorhaghe v. INS*, 38 F.3d 488, 497–98 (9th Cir. 1994).

c. Neither the ramshackle appearance of the vehicle, nor the unkempt, ill-dressed, and nervous appearance of the passengers in itself provides a sound basis for reasonable suspicion. *See United States v. Ortega-Serrano*, 788 F.2d 299 (5th Cir. 1986).

d. As outlined by the Supreme Court in *Brignoni-Ponce*, 422 U.S. at 884–85, the following are some of the common factors that an officer *may* rely upon in combination with one another in determining whether a vehicle or its occupant aliens may be detained on reasonable suspicion of INA violations:

(1) characteristics of the area in which the vehicle is encountered (e.g., an established thoroughfare for alien smuggling);

(2) proximity of that area to the U.S. border;

(3) usual patterns of alien-smuggling traffic, including the time of day favored for such activity;

(4) knowledge that illegal border crossings have recently occurred in the area where the vehicle is spotted;

(5) the driver's extraordinary behavior or driving irregularities, such as a sudden and abrupt exit from the highway onto an exit ramp (*see Rodriguez-Sanchez*, 23 F.3d at 1493) or similarly striking evasive maneuvers that exceed the merely negligent;

(6) telltale characteristics of the vehicle or its passengers (e.g., "The vehicle may appear to be heavily loaded, it may have an extraordinary number of passengers, or the officers may observe persons trying to hide." *Brignoni-Ponce*, 422 U.S. at 885).

e. Other examples of the "more particularized information" that courts require to justify reasonable suspicion detentions of vehicles or passengers include the following, *see Hernandez-Alvarado*, 891 F.2d at 1417:

(1) tips from informants that a specific vehicle or address is being used for smuggling or concealing illegal aliens;

(2) evidence that a pickup or delivery of aliens is likely to be made in a particular place and at a particular time, derived from observable facts (e.g., large numbers of footprints leading to a highway on a known alien-smuggling route and then discontinuing at the same roadside point, *see United States v. Cortez*, 449 U.S. 411, 419–21 (1981);

(3) forms of particularized behavior associated with the evasive tactics used in illegal entry, such as manifestly coordinated evasive behavior and slouching or similar unusual movements designed to avoid detection of vehicular passengers, *see United States v. Garcia-Nunez*, 709 F.2d 559 (9th Cir. 1983); and

(4) persons manifestly conducting counter-surveillance or serving as lookouts.

2. *Detention on the Basis of Suspected Misdemeanor Violations and the "Pretext" Issue*

Both an alien's failure to carry alien registration documentation and a first of-
fense of illegal entry into the United States constitute federal misdemeanors. *See*
8 U.S.C. §§ 1304(e) [6] and 1325. We are advised that these are the provisions of
the INA that would most commonly provide the basis for a reasonable suspicion
that transient aliens have committed or are committing a crime.

Reliable indications that the suspect is an alien, coupled with his failure to
produce alien registration documentation or a "green card," may provide probable
cause for an arrest under the lack of documentation provision of § 1304(e). *See*
*Mountain High Knitting, Inc.*, 51 F.3d at 218; *Martinez*, 831 F.2d at 828. In the
former decision, however, the Ninth Circuit raised some doubts concerning reli-
ance on § 1304 as an independent basis for warrantless alien arrests. Without actu-
ally resolving the issue, the court indicated a strong predisposition to accept the
aliens' contentions that the INS did not actually arrest them for violating the lack
of documentation provision and that arrests on that basis were only a pretext for
*civil* arrests on suspicion of illegal entry for purposes of deportation. *Mountain*
*High Knitting, Inc.*, 51 F.3d at 218. On the basis of those contentions, the Ninth
Circuit remanded the case for the district court to assess "whether reasonable
INS officers would have arrested appellants solely for violating § 1304(e) absent
suspicion of illegal entry." *Id.* at 219.

With respect to § 1325's illegal entry provision, the Ninth Circuit has held that,
while the lack of documentation or "other admission of illegal presence may be
some indication of illegal entry," it does not without more provide probable cause
for a violation of 8 U.S.C. § 1325(a). *Mountain High Knitting, Inc.*, 51 F.3d at
218; *Gonzales*, 722 F.2d at 476–77. The Ninth Circuit has also stressed the signifi-
cance of the distinction between illegal *entry* (a crime that is subject to enforce-
ment by state officers) and mere "illegal presence," which generally provides
grounds only for civil deportation and is therefore not subject to non-federal en-
forcement. *Id.* That distinction has additional significance for purposes of Cali-
fornia law, which requires that warrantless arrests for misdemeanors (such as a
first illegal entry violation) may only be made when the offense is committed
in the arresting officer's presence. [7]

These considerations have raised concerns as to the viability of these frequently-
violated federal misdemeanor provisions as a basis for lawful detention or arrest
of alien suspects by state officers. Subject to the particular factual circumstances
and established federal prosecution practices, we nonetheless believe that Cali-

---

[6] The requirements of 8 U.S.C. § 1304(e) apply only to aliens who have been registered and issued a registration
receipt card. *See United States v. Mendez-Lopez*, 528 F. Supp. 972 (N.D. Okla. 1981). An alien's failure to register
with INS after remaining in the United States for 30 days or longer is separately prohibited under 8 U.S.C. § 1302.
Violations of the latter section are punishable by up to six months imprisonment under 8 U.S.C. § 1306 and con-
sequently also constitute misdemeanors under California law.

[7] This requirement could present special problems in connection with the illegal entry misdemeanors — which have
been considered complete and consummated (and thus no longer subject to an officer's personal observation) when
the alien has reached a "place of repose" within the United States. *See Gates*, 193 Cal. App.3d at 216. This issue
is discussed in further detail in section II.C.3, *infra*.

fornia police may validly rely upon the INA's misdemeanor offenses, as well as its felony offenses, in detaining alien suspects on reasonable suspicion of a federal criminal violation. We base this conclusion on several considerations.

Initially, we do not believe that the restrictive "pretext" holding in *Mountain High Knitting* should be considered generally applicable to investigative detentions of the type at issue here. Although *Mountain High Knitting* subjected a full-fledged *arrest* (based on probable cause of a § 1304(e) violation) to additional scrutiny for pretext, it does not purport to establish a general rule imposing this second layer of scrutiny upon the reasonable suspicion assessments that suffice to justify preventive detention.

By definition, a reasonable suspicion does not entail the same degree of specificity and certainty regarding the suspected offense as does a determination of probable cause.[8] In this regard, the courts have specifically upheld the validity of *Terry* detentions imposed by state officers in order to allow for the arrival of federal officers to make a more informed, expert assessment of probable cause. As explained by the Sixth Circuit in upholding a 45-minute detention of drug suspects to await arrival of trained DEA agents: "The sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions." *United States v. Winfrey*, 915 F.2d 212 (6th Cir. 1990), *cert. denied*, 498 U.S. 1039 (1991). This view is further confirmed by the Supreme Court's repeated observation that, in assessing the reasonableness of *Terry* stops, "the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *United States v. Montoya de Hernandez*, 473 U.S. 531, 544 (1985); *Adams v. Williams*, 407 U.S. 143, 145 (1972). As a general rule, therefore, we do not believe that state officers can be expected to make subtle judgments concerning the vagaries of federal prosecution policy in exercising their authority to detain suspects on reasonable suspicion that a criminal violation of the INA has occurred. Such complex assessments may properly be left to the federal officers who are responsible for making probable cause and arrest determinations when they arrive at the scene of detention. Thus, unless the state and local police are privy to firm and specific information that federal officials will *not* prosecute INA misdemeanor violations, we believe they may impose investigative detention based on reasonable suspicion that an alien has not registered with the INS as required, is not in possession of required registration documentation, or has illegally entered the United States.

Although the lack of proper documentation does not, without more, provide probable cause for arrest based on an illegal entry violation, the Ninth Circuit has acknowledged that it "may be some indication of illegal entry." *Gonzales,*

---

[8] This point is well-illustrated in *Ramirez-Sandoval*, 872 F.2d at 1395, where the Ninth Circuit upheld a reasonable suspicion detention based upon circumstances which indicated merely that the occupants of a parked van "may well have been engaged in illegal activity."

722 F.2d at 477. Accordingly, we believe that in appropriate circumstances — e.g., where there are other objective indicators of illegal entry, such as the time, place, and circumstances of the suspect's movements — lack of proper documentation may provide grounds for *reasonable suspicion* that an alien has committed an illegal entry. Armed with such reasonable suspicion that a federal crime has occurred, it is appropriate and consistent with relevant precedent for state officers to detain the undocumented alien for a reasonable period pending an expert determination of probable cause and suitability for arrest by the Border Patrol or other INS agents. *See Winfrey*, 915 F.2d at 217–18. Again, however, such reasonable detention practices would be vulnerable to challenge on the "pretext" grounds invoked in *Mountain High Knitting* if federal authorities have made it clear that illegal entry misdemeanors will not be prosecuted and that the sole remedy to be pursued for such violations is civil deportation.

Additionally, it is not clear that the California Code's provision that warrantless misdemeanor *arrests* can only be made when the misdemeanor was committed in the officer's presence is necessarily applicable to otherwise valid *investigative detentions*. In terms, that provision applies only to arrests, *see* Cal. Penal Code § 836(a) (West 1994), and investigative detentions under *Terry* are legally distinct from full-fledged arrests. In that regard, the California Court of Appeal described the California standard for investigative detentions as follows:

> An investigative detention is justified when the facts and circumstances known or apparent to the officer, including specific or articulable facts, cause him to suspect (1) a *crime* has occurred and (2) the person he intends to detain is involved in the criminal activity. (*In re Tony C.* (1978), 21 Cal.3d 888, 893, 148 Cal. Rptr. 366, 582 P.2d 957.)

*In re Carlos M.*, 220 Cal. App.3d 372, 380, 269 Cal. Rptr. 447, 452 (Cal. App. 4 Dist. 1990) (emphasis added). Significantly, the investigative detention standard requires only reasonable suspicion that a "crime" has occurred, and not necessarily a felony. Accordingly, while we would defer to the California legal authorities' interpretations of California law, we believe that alien suspects may be detained by state officers on reasonable suspicion of a misdemeanor violation of the INA even though the officer did not personally observe commission of the offense and therefore could not himself lawfully undertake a warrantless arrest of the suspect under California law. Although the state officers might not themselves be able to arrest the federal misdemeanor suspects — at least absent probable cause that a separate state felony has been committed — their authority to assist federal officers in doing so is well established.

3. *Illegal Entry as a Basis for Arrest—the Complete or Continuing Offense Issue*

As indicated above, special questions have been raised concerning the utility of the illegal entry statute, 8 U.S.C. § 1325(a), as a basis for detention or arrests by state officers. In *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir. 1979), the Ninth Circuit held that illegal entry is not a continuing violation — that is, the offense is complete *for statute of limitations purposes* upon the alien's successful entry into the United States. In *Gonzales*, the Ninth Circuit indicated that *Rincon-Jimenez* also stands for the proposition that a § 1325 violation is also complete "at the time of entry" for purposes of determining whether the offense has been committed in the presence of an officer under applicable state law. *See* 722 F.2d at 475–76. Since § 1325 is a misdemeanor, a California officer cannot make a warrantless arrest for its violation unless it is committed in his presence. In light of these considerations, in *Gates v. Superior Court*, the court held: "Once an alien has reached a place of repose within the country, the misdemeanor of improper entry ends. At that point, an LAPD officer may not *arrest* for this offense because it did not occur in the officer's presence." 193 Cal. App.3d at 216 (emphasis added).

We should note, however, that aspects of the Supreme Court's opinion in *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), cast some doubt upon the proposition that an illegal entry violation is complete upon entry and therefore cannot be considered a "continuing" crime that can be observed by an officer after the alien has cleared the border. In that opinion, the Court stated that the presence of an unregistered alien who had entered the United States illegally "without more, constitutes a crime" and that such an alien's "release within our borders would immediately subject him to criminal penalties." *Id.* at 1047. Notwithstanding the dissent's specific invocation of the holding in *Rincon-Jimenez*, *id.* at 1057 (White, J., dissenting), the Court stated, "We need not decide whether or not remaining in this country following an illegal entry is a continuing or a completed crime under § 1325." *Id.* at 1047. If the Court were to view an undetected illegal entry as a continuing crime, the "committed in the presence" requirement of California law would present no obstacle to warrantless arrests of illegal entrants by California officers.

Absent an authoritative clarifying decision on this issue, however, warrantless arrests by California state officers for illegal entry violations must be considered legally invalid when the alien has already completed his entry into the United States.

The law is not clear, however, as to exactly when an illegal entry is complete for purposes of determining whether it has occurred in the presence of the arresting officer. Without explanation, analysis, or citation of authority, the *Gates* opinion tersely states that an illegal entry is complete for that purpose when "an alien has reached a place of repose within the country," 193 Cal. App.3d at 216. Despite its lack of analysis, this statement remains the most authoritative interpretation of the California "in presence" requirement as applied to illegal entry viola-

tions. Applying that interpretation, we do not believe that aliens apprehended in the vehicle in which they have illegally crossed the border would be held to have reached a "place of repose" within the United States as long as the apprehension occurs before the aliens have been delivered to their immediate arrival destination within the United States. *Cf. United States v. Aslam*, 936 F.2d 751, 755 (2d Cir. 1991). Under those circumstances, we believe warrantless arrests would be permissible under the formulation adopted in *Gates*.

In any event, we believe that reasonable suspicion that such illegal entry has occurred enables state officers to detain such alien suspects for reasonable periods pending evaluation, processing, and possible arrest by Border Patrol officers. That raises the question of what constitutes a reasonable period for such purposes.

### D. *Length of Detention Issues*

In light of the San Diego Police Force policy of limiting the detention of alien suspects (pending the arrival of Border Patrol assistance) to 20 minutes, you have inquired whether longer detention periods of, for example, one hour would be consistent with Fourth Amendment requirements.

Where the police have *probable cause to arrest* the alien suspect, periods of detention lasting one-hour or more would present no constitutional problem. *See United States v. Mondello*, 927 F.2d 1463, 1471 (9th Cir. 1991) (90-minute detention of drug suspect upheld where positive canine sniff test had already established probable cause). The pertinent time limitation in the arrest context is the requirement that the arrestee must generally[9] be given a probable cause hearing before a magistrate or judge within 48 hours after arrest. Thus, an alien suspect who may be legitimately regarded as under arrest may be detained for periods exceeding one-hour pending the arrival of Border Patrol agents or other necessary federal enforcement resources. However, where the detention follows a mere investigative stop based on reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968) — for example, where probable cause for arrest is lacking and does not materialize during the stop — detention for an excessive length of time under the circumstances may violate the Fourth Amendment's standard of reasonableness.

In *United States v. Sharpe*, 470 U.S. 675, 685 (1985), the Supreme Court established that there is "no rigid time limitation on *Terry* stops," but that a stop may be excessive if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687.[10] As the Court more fully explained in upholding a 20-minute detention:

---

[9] The temporal limitation on detention of an arrestee without a magistrate's or judge's determination of probable cause may sometimes be less than 48 hours (i.e., the delay must never be "unreasonable" under the circumstances) and sometimes more (i.e., when there is a "bona fide emergency or other extraordinary circumstance"). *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56–57 (1991).

[10] We do not believe that *United States v. Place*, 462 U.S. 696 (1983) establishes a hard rule that a detention for as long as 90 minutes, whether of luggage or person, is per se excessive and unreasonable. There, the Court held that the 90-minute detention of a suspect's luggage to arrange for a canine sniff test was excessive and unreason-

> While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.

*Id.* at 685 (quoting *United States v. Place*, 462 U.S. at 709 (citations omitted)).

The Court reiterated this pragmatic approach to the length-of-detention issue in *Montoya de Hernandez*, where it upheld the reasonableness of a *16-hour* border detention of a suspected alimentary canal drug-smuggler. As the Court stated:

> Here, respondent was detained incommunicado for almost 16 hours before inspectors sought a warrant; . . . . This length of time undoubtedly exceeds any other detention we have approved under reasonable suspicion. But we have also consistently rejected hard-and-fast time limits, *Sharpe, supra*; *Place, supra*, at 709, n.10. Instead, "common sense and ordinary human experience must govern over rigid criteria." *Sharpe, supra*, at 685.

473 U.S. at 542. However, the 16-hour detention in *Montoya de Hernandez* occurred in the border context, and the holding therefore should not be considered generally applicable to detentions outside the border area.

Thus, the Supreme Court has expressly rejected the imposition of rigid, arbitrary time limits upon the permissible duration of detention for *Terry* stops. Instead, the reasonableness of the detention is evaluated in light of the particular purpose of the stop in question and the time "reasonably needed" to take necessary and appropriate measures to achieve that purpose. The dispositive question is whether the detention is *"unnecessarily* prolonged." *Sharpe*, 470 U.S. at 685. [11]

Guided by these considerations, various federal courts have upheld *Terry* detentions ranging in length from 20 minutes to two hours. *E.g., Sharpe*, 470 U.S.

able under the circumstances. *Id.* at 709. The Supreme Court's subsequent opinion in *Sharpe*, however, expressly limited *Place*'s reach by stressing that in *Place* the police had possessed prior knowledge of the suspect's arrival time, could therefore have made advance arrangements for more expeditious processing, and thus had not acted diligently in pursuing their investigation. 470 U.S. at 684-85. *Sharpe* thus makes clear that the police's exercise of reasonable diligence, rather than any arbitrarily-drawn time limit, is the crucial factor in determining Fourth Amendment reasonableness in this context.

[11] *Sharpe*'s specific rejection of rigid, preconceived limitations on the duration of *Terry* stops is consistent with the Supreme Court's more recently-stated emphasis that Fourth Amendment requirements for prompt probable cause hearings following warrantless arrests do "not impose on the States a rigid procedural framework. Rather, individual States may choose to comply in different ways." *County of Riverside*, 500 U.S. at 53 (vacating as erroneous a Ninth Circuit panel's contrary holding that "no flexibility was permitted," *see id.* at 54).

41

at 687 (20-minute detention not unreasonable); *Bloomfield*, 40 F.3d at 917 (one-hour detention of motorist to await drug-sniffing dog held reasonable); *United States v. Adams*, 39 F.3d 1178 (4th Cir. 1994) (unpublished opinion) (45-minute detention upheld as reasonable); *United States v. Frost*, 999 F.2d 737, 741–42 (3d Cir.), *cert. denied*, 510 U.S. 1001 (1993) (detention of nearly one hour to await drug dog held reasonable); *Courson v. McMillian*, 939 F.2d 1479, 1491 (11th Cir. 1991) (30 minutes not unreasonable for an investigatory stop); *Jackson v. Wren*, 893 F.2d 1334 (6th Cir. 1990) (unpublished opinion) (detention for over two hours to await arrival of DEA agents upheld); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988), *cert. denied*, 489 U.S. 1019 (1989) (50-minute roadside detention to await drug dog held reasonable); *United States v. Davies*, 768 F.2d 893, 902 (7th Cir.), *cert. denied*, 474 U.S. 1008 (1985) (45-minute detention "for further questioning and advice from their superiors" held a valid investigative stop); *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir.), *cert. denied*, 474 U.S. 849 (1985); (25-minute detention upheld); *United States v. Borrero*, 770 F. Supp. 1178, 1189–91 (E.D. Mich. 1991) (70-minute detention by DEA agents at airport held reasonable).

It should be noted, however, that an opinion issued by a Ninth Circuit panel in 1994 suggests a more restrictive approach to the length-of-detention issue. In *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051 (9th Cir. 1994) (*"Currency"*), Judge Reinhardt held that the 90-minute detention of a drug suspect's luggage, pending the arrival of a drug-sniffing dog, was in itself sufficient to invalidate the seizure under the Fourth Amendment. Relying heavily on the Supreme Court's baggage-detention ruling in *Place*— while seeking to minimize the Court's subsequent emphatic rejection of "rigid time limitations" in *Sharpe* [12] — the court adopted the view that the *Place* opinion established an "outer boundary of permissible seizures" that falls "somewhere short of 90 minutes." *Currency*, 16 F.3d at 1060.

We believe that this aspect of the *Currency* holding is irreconcilable with the Supreme Court's holdings in *Sharpe* and *Montoya de Hernandez*. As demonstrated in the quotes set forth above, the *Sharpe* opinion repeatedly and unmistakably emphasized that the constitutionality of *Terry* stops may not be mechanically measured against any pre-ordained time limitation. It held that the establishment of such a time limitation "is clearly and fundamentally at odds with our approach in this area." 470 U.S. at 686. Yet that is precisely what the panel purported to ordain in the *Currency* case ("the detention of Morgan's baggage violated the Fourth Amendment solely because of its length"). 16 F.3d at 1060.

---

[12] The *Currency* court's broad application of the *Place* ruling is incompatible with the Supreme Court's narrowing interpretation of that same ruling in the *Sharpe* opinion. *See supra* note 10. As the Court explained in *Sharpe*, "[I]n *Place*, we expressly rejected the suggestion that we adopt a hard-and-fast time limit for a permissible *Terry* stop." 470 U.S. at 686. This emphatic and unambiguous holding in *Sharpe* was studiously ignored by the panel opinion in the *Currency* case. *See* 16 F.3d at 1060 n.17.

Notwithstanding our view that *Currency's* adoption of a fixed time limit for *Terry* stops is erroneous — a limit that would fall "somewhere short of 90 minutes," but certainly no lower than 30 minutes [13] — that opinion has neither been overruled nor directly refuted by subsequent Ninth Circuit opinions. Accordingly, the approach reflected in the *Currency* opinion should be taken into account in formulating enforcement guidelines in this area. Moreover, it is significant to note that the *Currency* opinion imposed a 90-minute limitation on luggage detentions; it is reasonable to expect that that panel might be inclined to impose stricter limitations on detentions of persons.

However, considered in conjunction with the more authoritative Supreme Court holding in *Sharpe*, as well as more permissive Ninth Circuit opinions such as *Mondello*, we believe that the *Currency* opinion should be interpreted no more broadly than its holding specifically requires — i.e., that investigative detentions may not exceed 90 minutes in duration. To extrapolate a still more restrictive rule for the Ninth Circuit (e.g., a rule treating one-hour stops as per se unreasonable) would ascribe to the *Currency* opinion more weight than is warranted by its juridical authority relative to *Sharpe*, *Mondello*, and other less restrictive precedents. *Cf. County of Riverside*, 500 U.S. at 54–55 (where the Supreme Court rejected a comparably restrictive and "inflexible" Fourth Amendment interpretation by a Ninth Circuit panel).

We believe that the necessity of detaining immigration suspects until Border Patrol/INS agents arrive is analogous to the necessity of detaining drug suspects pending the arrival of DEA agents or drug-sniffing dogs for purposes of evaluating the duration of detention for reasonableness. In both situations, the purpose of the delay is to allow for the utilization of enhanced investigative or enforcement resources that are necessary to effectuate the legitimate purpose of the investigative detention. *See Winfrey*, 915 F.2d at 217 (45-minute detention of drug suspects by local officers to await arrival of federal DEA agents upheld, where "[t]he sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions"). Accordingly, the precedents upholding various periods of detention as reasonable to permit the arrival of DEA agents or drug-sniffing dogs provide valid guidelines for determining a reasonable period of detention in the immigrant suspect situations posed here as well. Based on those precedents, we believe that if Border Patrol agents exercising reasonable diligence require 45 minutes to one hour to reach the scene of detention, detentions of that length would be sustainable under *Sharpe* where there is reasonable suspicion that the detained aliens have violated the federal immigration laws. We caution, however, that when Border Patrol Agents do not promptly arrest the de-

---

[13] *See Mondello*, 927 F.2d at 1471, where another Ninth Circuit panel (Trott, J.) upheld the reasonableness of a 30-minute investigative stop to permit the arrival of drug-detecting dogs. There is no suggestion in *Currency* of disagreement with *Mondello*'s approval of a 30-minute *Terry* detention.

tainees, the additional period of detention required by them should be counted in calculating the permissible duration of detention.

*Police Force Policies.* We note that further complications may arise in this area from the language contained in written guidelines or policies used by state or local police forces. For example, if such guidelines specify that subjects may only be detained based on reasonable suspicion of criminal activity that is *unrelated to the immigration laws*, the legal basis for detentions pending the arrival of Border Patrol agents could be undercut. *Sharpe* requires that an extended *Terry* detention must be related to "the law enforcement purposes to be served by the stop," 470 U.S. at 685, and Border Patrol assistance is obviously not needed to deal with criminal activity unrelated to immigration status.

It is our understanding that the need for expanding the maximum alien-suspect *Terry* detention period from 20 minutes to as long as one-hour is premised upon the time required for Border Patrol agents to arrive on the scene to further investigate and process the INA violation. Under *Sharpe*, such extended detention must be related to the law enforcement purposes to be served by the stop or the further reasonable suspicions arising during the stop. However, if a Police Force policy states that detentions may only be made for *non-immigration* enforcement purposes, detentions imposed to await the Border Patrol would be vulnerable to challenge based on the limiting language of the policy. To minimize this complication, state and local police forces could be urged to modify their policies or guidelines to remove provisions indicating that *Terry* stops and detentions of undocumented aliens must be based on reasonable suspicion of criminal activity that is unrelated to immigration status or enforcement of federal immigration law.

In sum, we conclude that "reasonable suspicion" detention of undocumented aliens by local police for periods in the range of 45 to 60 minutes should comply with Fourth Amendment requirements when that much time is required to enable Border Patrol agents to arrive at the scene exercising reasonable diligence. This assessment presumes that the involved local police force does not disavow any purpose of assisting federal enforcement of the immigration laws in making such stops. Although the Supreme Court's *Sharpe* opinion expressly repudiates any rigid time limitation on reasonable stops under *Terry*, we caution that the Ninth Circuit panel opinion in the *Currency* case has held that stops of 90 minutes, and perhaps less, are per se unreasonable under the Fourth Amendment. Accordingly, we would not recommend adoption of a guideline establishing a period any greater than 45 to 60 minutes as a benchmark for maximum permissible detention periods. Moreover, any guidelines or benchmarks adopted in this area should stress that the maximum permissible period is premised upon the assumption that such a time period is *needed* to allow for the arrival and assistance of Border Patrol agents or other necessary support resources. Guidelines or rules should indicate that extended detention periods ranging roughly from fifteen minutes to an hour are only justified when that much time is genuinely needed to carry out

the permissible objectives of the stop. Allowing for the arrival of Border Patrol agents to properly handle the suspected violation of federal immigration law provides such justification.

## E. *Transportation of Aliens by State/Local Police*

Given the difficulties of Border Patrol agents promptly reaching the scene where state officers have stopped alien suspects, you have asked whether it would be lawful for the state police to transport the suspects to the federal officials instead. The constitutional issue is whether such involuntary transportation would necessarily transform a valid investigative detention into an arrest that would violate the Fourth Amendment in the absence of probable cause.

In *Hayes v. Florida*, 470 U.S. 811 (1985), the Supreme Court held that the line between investigative detention and full-fledged arrest is crossed when the police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Id.* at 816. Similarly, in *United States v. Recalde*, 761 F.2d 1448 (10th Cir. 1985), the court upheld the Fourth Amendment claims of a drug suspect who "was taken from a public highway without his consent and transported five miles to a police station, where he was placed in a small room for further investigation and questioning." *Id.* at 1456. The Ninth Circuit invoked the Supreme Court's opinion in *Dunaway v. New York*, 442 U.S. 200 (1979), to the same effect in *Gonzales v. City of Peoria*, 722 F.2d at 477:

> If the seizure involves anything more than the brief and narrowly-defined intrusion authorized by *Terry*, it must be justified by probable cause. *Dunway*, 442 U.S. at 212; *Brignoni-Ponce*, 422 U.S. at 882. *Dunway* makes absolutely clear that where the defendant is transported to the police station and placed in a cell or interrogation room he has been arrested, even if the purpose of the seizure is investigatory, rather than accusatory. Because such a seizure constitutes an arrest, it must be supported by probable cause.

*Id.* at 477 (some citations omitted). *See also United States v. Obasa*, 15 F.3d 603, 608–10 (6th Cir. 1994) (holding that a detention following a highway taxi stop ripened into an arrest when the defendant was searched, given *Miranda* warnings, and transported back to the airport police station). These opinions reflect the view that the involuntary transportation of *Terry* detainees to a confined and coercive setting for further interrogation or investigation transforms the detention into an arrest, and can therefore be sustained only on the basis of probable cause.

Other opinions, however, have recognized that special circumstances may sometimes permit the limited transportation of *Terry* detainees without entailing an

unconstitutional arrest. The circumstances justifying such transport were summarized by the Ninth Circuit in *United States v. Baron*, 860 F.2d 911 (1988), *cert. denied*, 490 U.S. 1040 (1989), following a survey of the precedents:

> The principles that we distill from these cases are that the police may move a suspect without exceeding the bounds of the *Terry*-stop when it is necessary for safety or security reasons, *when it is the least intrusive method available to achieve the legitimate goals of the stop*, and when moving the suspect does not make the circumstances of the detention so coercive that the detention becomes indistinguishable from an arrest.

*Id.* at 915–16 (citations omitted; emphasis added).

Several recent California opinions have also recognized that transportation of a detained suspect may be authorized on less than probable cause where it is reasonably necessary to accomplish quickly the purposes of the detention. *In re Carlos M.*, 220 Cal. App.3d 372, 269 Cal. Rptr. 447 (1990); *In re Starvon*, 29 Cal. Rptr.2d 471 (Cal. App. 2 Dist. 1994). In *In re Carlos M.*, the court rejected arguments that the handcuffing and forced transportation of a juvenile sexual assault suspect to a hospital for identification by the victim were beyond the scope of a *Terry* stop and transformed the detention into a de facto arrest. In so holding, the court stressed that the officers were unable to obtain the suspect's consent to the transport because he spoke only Spanish and the detaining officer spoke no Spanish. The court also noted that alternative arrangements for bringing the victim to the scene of the detention would have required a two-hour delay. Taking all these facts into account, the court concluded that the transportation of the detained suspect was reasonable.

The leading decisions invalidating transportation of detainees have frequently stressed the coercive atmosphere of the place to which the suspects are transported — i.e., "the coerciveness created by isolating a suspect in a private space controlled by the police," *Baron*, 860 F.2d at 916 — rather than the act of transporting per se. We also consider it significant that both *Baron* and *In re Carlos M.* stressed the point that transporting detainees may be justified where it is the least intrusive means to achieve the legitimate goals of the investigative detention.

Where alien suspects are validly detained on reasonable suspicion of an immigration crime, the detention may be reasonably extended in order to permit Border Patrol agents to make an expert assessment of probable cause and propriety of arrest. *Cf. Winfrey*, 915 F.2d at 217–18. In some situations, the Border Patrol's assistance may be more promptly and safely obtained by transporting the aliens to the agents rather than by awaiting the latters' arrival (e.g., where their duty requirements make it unworkable for them promptly to leave a particular location when called by the state police). In those particular circumstances, we believe

that transporting the suspects a reasonable distance to the agents could properly be viewed as "the least intrusive method available to achieve the legitimate goals" of the detention, *Baron*, 860 F.2d at 915, and would not violate the Fourth Amendment. This conclusion assumes that the ensuing interrogation or assessment by the Border Patrol agents would take place in an unconfined or "noncoercive" location rather than in an enclosed or coercive setting such as a police station. *Compare Gonzales*, 722 F.2d at 477 (stressing that transporting suspects to police station and placing them in a cell or interrogation room results in an arrest, even if the purpose is "investigatory rather than accusatory").

## F. *Deputation of State Officers to Enforce Federal Immigration Laws*

You have also inquired whether state and local law enforcement personnel may be formally deputized or cross-designated as federal officers by the Attorney General in order to enhance their authority to enforce the immigration laws. So deputized, such personnel would be empowered to make warrantless arrests of illegal immigration suspects and perform certain other INA enforcement tasks that they might not otherwise be authorized to do in their capacity as state officers. [14] We conclude that the state officials could be deputized for these purposes, but it would be in the capacity of Deputy U.S. Marshals exercising special authority to enforce the immigration laws conferred on the U.S. Marshals Service by the Attorney General. [15]

This office has previously opined that there is adequate statutory authority for special deputations of state and local law enforcement officials (including members of the State Militia) for purposes of assisting federal law enforcement in a mass immigration emergency. *See* Memorandum for David Nachtsheim, Emergency Planning Coordinator, Immigration and Naturalization Service, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Operation Distant Shore Draft Plan* (Oct. 15, 1993). By special deputations, we referred to temporary designations as Deputy U.S. Marshals under the provisions of 28 U.S.C. §§ 561(f) and 566(c).

---

[14] Assuming state or local authorities agree to the federal deputation of their officers, and that such deputation is compatible with their status under California law, state law restrictions that would otherwise bar enforcement actions that Deputy U.S. Marshals are authorized to perform under federal law would be overridden by the Supremacy Clause in the case of state officers duly deputized under 28 U.S.C. §§ 566(c) or 561(f). *See* U.S. Const. art. VI, cl. 2.

[15] Individual state officers could also presumably be assigned on detail to the Department of Justice ("Department") or INS under the appropriate provisions of the Intergovernmental Personnel Act ("IPA"), 5 U.S.C. §§ 3372, 3374. It is our understanding that details under the IPA generally involve the temporary assignment of individual employees to full-time duty in a federal agency, rather than the conferring of special federal authority to be exercised within the context of the officer's ongoing state law enforcement duties. However, as further provided in the IPA, "The supervision of the duties of such an employee may be governed by agreement between the Federal agency and the State or local government concerned." 5 U.S.C. § 3374(c). Accordingly, if the pertinent state and local officials were agreeable, we see no reason why the IPA could not be used as authority for detailing designated state officers to INA enforcement operations insofar as the Department, the INS, and the relevant state authorities considered it useful to do so.

47

Under such arrangements, we believe the Attorney General should first confer special authority to enforce the immigration laws upon the Director of the U.S. Marshals Service ("USMS") under the provisions of 8 U.S.C. § 1103. [16] The Director of the USMS ("DUSMS") could then, in turn, deputize state and local officials to assist him in his charge to enforce the immigration laws under the provisions of either 28 U.S.C. § 561(f) [17] or, more probably, 28 U.S.C. § 566(c). The Department of Justice regulations implementing those statutory provisions specifically provide that the DUSMS is authorized to deputize "[s]elected federal, state, or local law enforcement officers *whenever the law enforcement needs of the U.S. Marshals Service so require.*" 28 C.F.R. § 0.112(2) (1995) (emphasis added). Although the "law enforcement needs" of the USMS would not normally extend to alien interdiction, that jurisdictional gap would be filled by the Attorney General's special assignment of INA enforcement authority under 8 U.S.C. § 1103.

This very approach was followed in August 1994, when the Deputy Attorney General (exercising authority delegated to her by the Attorney General) issued an order empowering the DUSMS to deputize Florida law enforcement officials as Deputy U.S. Marshals so that they could exercise INS enforcement responsibilities in the event of an immigration emergency. Under the order (which was effective for a period of one year), INS enforcement authority was first delegated to U.S. Marshals and U.S. Deputy Marshals under 8 U.S.C. § 1103, including the power to detain and arrest, for deportation or exclusion, persons entering or present in the United States in violation of law. The order went on to authorize the DUSMS to deputize and designate Florida law enforcement officers to exercise those same INS enforcement powers — specifically including the authority to make warrantless arrests and detentions for purposes of deportation — "pursuant to the direction of officers of the [INS]." Provision was made for Florida law enforcement officers to be sworn in as Deputy U.S. Marshals "immediately upon the commencement of a mass immigration emergency." Whether or not such arrangements would be considered practicable or desirable in other areas of massive illegal immigration, we are not aware of any reason why they could not be lawfully undertaken pursuant to the same statutory authorities.

TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[16] Under 8 U.S.C. § 1103, the Attorney General is authorized to confer on any employee of the United States, with the consent of the head of the Department or other independent establishment that employs such person, "any of the powers, privileges, or duties conferred or imposed . . . upon Officers . . . of the [Immigration and Naturalization] Service."

[17] A persuasive case can be made that deputations based upon 28 U.S.C. § 561(f) are only permitted when the person to be deputized is made an *employee* of the USMS — a complicating administrative process that would seem impracticable in the case of state and local police personnel. Special deputations of state and local police personnel would therefore be more realistically grounded upon the authority of 28 U.S.C. § 566(c).